**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ENRICO VACCARO, F. GREGORY DENEEN, and WILLIAM SLATER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NEW SOURCE ENERGY PARTNERS L.P., KRISTIAN B. KOS, TERRY L. TOOLE, DIKRAN TOURIAN, RICHARD D. FINLEY, V. BRUCE THOMPSON, JOHN A. RABER, STIFEL, NICOLAUS & COMPANY, INC., ROBERT W. BAIRD & CO. INC., JANNEY MONTGOMERY SCOTT LLC, OPPENHEIMER & CO. INC., and WUNDERLICH SECURITIES, INC.,<br><br>Defendants. | Civil Action No. 1:15-cv-08954 (KMW)<br><br>Hon. Kimba M. Wood |

# AMENDED CLASS ACTION COMPLAINT

Enrico Vaccaro, F. Gregory Deneen, and William Slater ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, for their Amended Class Action Complaint, allege upon personal knowledge as to themselves, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through their attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, Securities and Exchange Commission ("SEC") filings made by New Source Energy Partners L.P. ("New Source" or the "Partnership"), press releases and media reports published by and regarding New Source, analysts' reports and advisories about the Partnership, review of the docket in a lawsuit filed by New Source against one of its contract operators, New Dominion LLC ("New Dominion") (*New Source Energy*

*Partners LP v. New Dominion LLC*, Tulsa County Case No. CJ-2015-1239 (the "Tulsa Action")), and other publicly-available information concerning New Source, as well as interviews of confidential witnesses, as follows:

## SUMMARY OF ACTION

1. This action arises from the materially false and misleading Registration Statement (defined below) and Prospectus (defined below) issued in connection with New Source's May 2015 offering of its 11% Series A Cumulative Convertible Preferred Units ("Series A Preferred Units"). The Registration Statement and Prospectus contained materially false and misleading statements, and omitted to state material information necessary to make the statements made therein not misleading, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"). Specifically, the Registration Statement and Prospectus omitted material information regarding the severe and ongoing cash flow problems that New Source was experiencing, which seriously jeopardized its ability to continue as a going concern.

2. New Source was formed in October 2012 to acquire and own oil and natural gas properties in the United States. New Source operated in two segments: (a) exploration and production; and (b) oilfield services. It was engaged in the development and production of onshore oil and natural gas properties that extend across conventional resource reservoirs in east-central Oklahoma. Its oil and natural gas properties consisted of non-operated working interests, primarily in the Misener-Hunton Formation.

3. In addition, New Source was engaged in oilfield services through its oilfield services subsidiaries. Its oilfield business provided well site services during the drilling and completion states of a well, including full service blowout prevention installation and pressure

testing services, to the oil and natural gas industry, primarily in Oklahoma, Texas, New Mexico, Kansas, Pennsylvania, Ohio, and West Virginia.

4. In February 2013, the Partnership completed a public offering of 4,000,000 common units representing limited partner interests in the Partnership at a price of $20.00 per common unit (the "IPO"). In connection with the closing of the IPO, the Partnership entered into a development agreement with New Source Energy Corporation ("NSEC"), an independent energy company engaged in the development and production of onshore oil and liquids-rich natural gas projects in the United States, and New Dominion, a company that operates hundreds of oil and natural gas wells throughout central Oklahoma.

5. As of March 6, 2015, 25% of New Source's general partner was owned by an entity controlled by David J. Chernicky ("Chernicky"), who was also the co-founder and beneficial owner of New Dominion. Chernicky also controlled approximately 90% of the shares of NSEC as of March 2015, and formerly served as Chairman of the board of directors of New Source and its general partner (the "Board").

6. Pursuant to the Participation Agreements and Joint Operating Agreements to which New Source and New Dominion were parties, New Dominion was to pay New Source (and certain other working interest owners) their *pro rata* share of production, and invoice the working interest owners for the costs of operation.

7. By early 2015, tensions among Chernicky and the defendants herein, among others, had escalated to such an extent that New Dominion, NSEC, and Chernicky filed suit against New Source in an Oklahoma State Court (*New Dominion LLC v. New Source Energy Partners LP*, Tulsa County Case No. CJ-2015-00123 (the "Chernicky Litigation")). The suit arose out of alleged misrepresentations made by defendants Kos and Finley in convincing

Chernicky to form NSEC and New Source, and ultimately to transfer significant working interests to New Source.

8. As a result of these alleged misrepresentations, according to Chernicky, New Source purportedly improperly acquired working interest, revenue, and property from Chernicky, and subsequently failed to pay its prepayments and joint interest billings in a timely fashion. Chernicky also alleged that defendant Kos, acting on behalf of NSEC and New Source, caused NSEC to convey certain properties to New Source at below market value. In the process, according to Chernicky, liabilities of the NSEC properties that should have been transferred to New Source were left on the books of NSEC.

9. In order to thwart New Source's alleged scheme to obtain revenue from Chernicky's working interests before starving out New Dominion as operator by withholding prepayments and joint interest billings, according to Chernicky, NSEC allegedly factored to New Dominion the amounts due and owing to it by New Source.

10. As a countermove to Chernicky's lawsuit, on March 31, 2015, New Source filed the Tulsa Action against New Dominion in the District Court of Tulsa County, alleging that New Dominion had been withholding revenue due and owing to New Source since at least late 2014.

11. Mired in multiple litigations, starving for cash and concerned about its ability to continue as a going concern, New Source decided to offer securities via shelf takedown, pursuant to a registration statement filed with the SEC a year earlier.

12. On April 21, 2014, New Source had filed with the SEC a base prospectus and shelf registration statement on Form S-3 (the "Registration Statement"). With this Registration Statement in place, New Source would be able to quickly access the capital markets without SEC staff review or delay.

13. Pursuant to the Registration Statement, on May 4, 2015, New Source announced a public offering (the "Offering") of $40 million worth of its Series A Preferred Units. This shelf takedown was offered with the prospectus and accompanying prospectus supplement, both dated May 5, 2015 and filed with the SEC on May 7, 2015 (collectively, the "Prospectus") (together, the Prospectus and the Registration Statement are hereinafter referred to as the "Offering Documents").

14. New Source stated that it expected to receive net proceeds of approximately $40.4 million from the Offering, which it purportedly intended to use in order to repay a portion of the indebtedness outstanding under its credit facility. In the process of attempting to prop up its faltering finances and secure its future, however, the Partnership misrepresented the true state of its financial condition and failed to disclose material information regarding the future of New Source.

15. Although SEC regulations required New Source to ensure that purchasers of the Series A Preferred Units had information that was accurate as of the date the units were sold, the Partnership failed to amend the Prospectus to reflect any facts or events arising after the effective date of the Registration Statement, facts that, individually and in the aggregate, represented a fundamental change in the information set forth in the Registration Statement. As such, this class action is filed on behalf of all persons and/or entities that purchased or otherwise acquired Series A Preferred Units pursuant to and/or traceable to the Offering Documents, and were damaged thereby.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act.

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 21D of the Securities Act.

18. Venue is proper in this District pursuant to Section 21D of the Securities Act and 28 U.S.C. §1391(b), because many of the acts and practices complained of herein occurred in this District, including the dissemination of material false and misleading statements complained of herein into this District. In addition, the Underwriter Defendants (as defined below) either maintain their principal places of business in this District and/or are registered to do business in this District.

19. In connection with the acts, conduct, and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets, including the New York Stock Exchange ("NYSE").

## PARTIES

20. Plaintiff Enrico Vaccaro ("Vaccaro") purchased and/or acquired 1,750 New Source Series A Preferred Units on May 5, 2015, pursuant and/or traceable to the Prospectus, and was damaged thereby. Mr. Vaccaro purchased his units directly from Defendant Janney Montgomery.

21. Plaintiff F. Gregory Deneen ("Deneen") purchased and/or acquired 3,000 New Source Series A Preferred Units on May 5, 2015, pursuant and/or traceable to the Prospectus, and was damaged thereby. Mr. Deneen purchased his units directly from Defendant Baird.

22. Plaintiff William Slater ("Slater") purchased and/or acquired 1,000 New Source Series A Preferred Units on May 5, 2015, pursuant and/or traceable to the Prospectus, and was damaged thereby. Mr. Slater purchased his shares directly from Defendant Stifel.

23. Defendant New Source is a Delaware limited partnership formed in October 2012 to own and acquire natural gas properties in the United States. Its general partner, New Source Energy GP, LLC ("New Source GP"), manages the operations and activities of New Source. The Partnership's principal executive offices are located at 914 North Broadway, Suite 230, Oklahoma City, Oklahoma 73102. On March 15, 2016, New Source GP and New Source filed voluntary petitions for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). As such, pursuant to section 362(a) of the Bankruptcy Code, this action is stayed as to New Source and New Source GP.

24. Defendant Kristian B. Kos ("Kos") was, at all relevant times, the Chairman of the board of directors (the "Board") and the Chief Executive Officer ("CEO") of New Source. From July 2011 to May 2014, Defendant Kos was the president and CEO of NSEC. Defendant Kos participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC. As of March 6, 2015, 69.4% of New Source's general partner was owned by an entity controlled by Defendant Kos, 5.6% was owned by NSEC, and 25.0% was owned by an entity controlled by Chernicky, who also owns 88.9% of NSEC.

25. Defendant Terry L. Toole ("Toole") was, at all relevant times, a director and Chairman of the Audit Committee of the New Source Board. Defendant Toole participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC.

26. Defendant Dikran Tourian ("Tourian") was, at all relevant times, a director and the Chief Operating Officer ("COO") of New Source. Defendant Tourian participated in

preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC.

27. Defendant Richard D. Finley ("Finley") was, at all relevant times, the Chief Financial Officer ("CFO") and Treasurer of the Board of New Source. Defendant Finley also served as the CFO and Treasurer of NSEC from August 2011 until May 2014. Defendant Finley participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC. Finley resigned as CFO effective June 30, 2015.

28. Defendant V. Bruce Thompson ("Thompson") was, at all relevant times, a director of New Source. Defendant Thompson participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC.

29. Defendant John A. Raber ("Raber") was, at all relevant times, a director of New Source. Defendant Raber participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC.

30. The Defendants listed above, in paragraphs 24 through 29, are collectively referred to herein as the "Individual Defendants."

31. By reason of their management positions and their ability to make public statements in the name of the Partnership, the Individual Defendants were and are controlling persons, and had the power and influence to cause, and did cause, the Partnership to engage in the conduct alleged in this Complaint.

32. By reason of their positions as executive officers and/or directors of New Source, the Individual Defendants were, at all relevant times, controlling persons within the meaning of Section 15 of the Securities Act. Because of their executive and directorial positions with New Source, the Individual Defendants had access to the adverse and undisclosed information about

New Source's business condition and financial results. Further, as particularized herein, the Individual Defendants were able to and did control the contents of the Registration Statement, the Prospectus, and various public statements incorporated by reference therein.

33. Defendant Stifel, Nicolaus & Company, Inc. ("Stifel") served as underwriter to New Source in connection with the Offering. Defendant Stifel participated in the preparation and dissemination of the Prospectus. Defendant Stifel is a wholly-owned subsidiary of Stifel Financial Corp. ("Stifel Financial"), a financial holding company headquartered in St. Louis, Missouri. Stifel Financial's stock trades on the NYSE. Both Stifel and Stifel Financial maintain offices in New York and, pursuant to the New York State Division of Corporations, are authorized to do business in the State of New York.

34. Defendant Robert W. Baird & Co. Inc. ("Baird") served as an underwriter to New Source in connection with the Offering. Defendant Baird participated in the preparation and dissemination of the Prospectus. Defendant Baird maintains offices at 610 5th Avenue, New York, New York 10020 and, pursuant to the New York State Division of Corporations, is authorized to do business in the State of New York.

35. Defendant Janney Montgomery Scott LLC ("Janney") served as an underwriter to New Source in connection with the Offering. Defendant Janney participated in the preparation and dissemination of the Prospectus. Defendant Janney maintains its corporate headquarters at 575 Lexington Avenue, New York, New York 10022.

36. Defendant Oppenheimer & Co., Inc. ("Oppenheimer") served as an underwriter to New Source in connection with the Offering. Defendant Oppenheimer participated in the preparation and dissemination of the Prospectus. Defendant Oppenheimer maintains its headquarters at 85 Broad Street, New York, New York 10004.

37. Defendant Wunderlich Securities, Inc. ("Wunderlich") served as an underwriter to New Source in connection with the Offering. Defendant Wunderlich participated in the preparation and dissemination of the Prospectus. Defendant Wunderlich maintains multiple offices in New York and, pursuant to the New York State Division of Corporations, is authorized to do business in the State of New York.

38. Stifel, Baird, Janney, Oppenheimer, and Wunderlich served as lead underwriters for the Offering and are collectively referred to herein as the "Underwriter Defendants." New Source, the Individual Defendants, and the Underwriter Defendants, collectively, are referred to herein as "Defendants."

39. Representatives of the Underwriter Defendants also assisted the Partnership and the Individual Defendants in planning the Offering. They also purported to conduct an adequate and reasonable investigation into the business, operations, and plans of the Partnership, an undertaking known as a "due diligence" investigation. During the course of their due diligence, the Underwriter Defendants had continual access to confidential corporate information concerning the Partnership and its business, financial condition, cash flow, plans, and prospects.

40. The Underwriter Defendants are liable for the materially misleading statements contained in the Prospectus, which were a substantial factor leading to the harm complained of herein. In fact, had any of the Underwriter Defendants conducted even the most minimal due diligence, they would have discovered that New Source was having serious financial difficulties, and that the Partnership was offering the Series A Preferred Units as a last-ditch effort to keep the Partnership afloat.

41. The Underwriter Defendants received millions of dollars in fees and options to purchase an additional 264,000 Series A Preferred Units in the Offering. In return for this

compensation, the Underwriter Defendants were willing to offer the Series A Preferred Units to the investing public on behalf of New Source. In the course of their investigation into New Source, the Underwriter Defendants could and should have discovered the misleading statements and material omissions contained in the Prospectus. The Underwriter Defendants were clearly negligent in failing to uncover and disclose these facts.

## SUBSTANTIVE ALLEGATIONS

### The False and Misleading Prospectus

42. Pursuant to the Prospectus, disseminated a year after the Registration Statement, New Source offered 1,760,000 of its 11.00% Series A Preferred Units at a price of $25.00 per unit. The Prospectus set forth that distributions on the Series A Preferred Units would be payable at an initial rate of 11.00% per annum of the stated liquidation preference of $25.00. As shown herein, the Prospectus was materially false and misleading, failing to disclose the severe cash flow problems to which New Source was subject and which had drastically increased since the original filing of the Registration Statement.

43. Recognizing the problems inherent in selling securities via a delayed offering pursuant to a shelf registration mechanism, SEC Regulation S-K provides that:

> for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof. 17 C.F.R. § 229.512(a)(2).

44. In order to ensure that purchasers of these types of securities have accurate information whenever the securities are sold, the SEC requires issuers of shelf-offerings to amend the prospectus "to reflect…any facts or events arising after the effective date of the registration statement…which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement." 17 C.F.R. § 229.512(a)(1)(ii).

45. Without section (a)(2), above, this ongoing reporting requirement would be meaningless, since purchasers who acquired securities in a shelf offering more than three years after the initial registration would find their Section 11 claims barred by the statute of limitations, even if they bought the securities in reliance on a fraudulent, post-effective amendment to the registration. To remedy this problem, § 229.512(a)(2), operating in the context of securities offered pursuant to the post-effective registration, deems the offering date to be the post-effective registration date, not the initial registration date.

46. Therefore, where an offering is made pursuant to a common registration statement, but with an amended prospectus, each such post-effective amendment will be deemed to be a new registration statement relating to the securities offered therein. Because of the unique way that securities are offered under a shelf registration, each new issuance of securities requires amending the registration statement, thereby creating a new registration statement for purposes of giving rise to liability under Section 11. As described herein, the Offering Documents were woefully inadequate in describing New Source's dire financial condition as of the effective date of the Offering.

47. The Prospectus stated that New Source expected to receive net proceeds of approximately $40.4 million from the Offering, after deducting underwriting discounts and estimated offering expenses, and that New Source intended to use all of the net proceeds from the Offering to repay a portion of the indebtedness outstanding under its credit facility.

48. The Prospectus further stated that, on May 1, 2015, New Source had entered into an eighth amendment to its credit agreement dated as of February 13, 2013, by an among New Source, as borrower, Bank of Montreal, as administrative agent, and various other lenders (the "Credit Agreement"). The eighth amendment to the Credit Agreement: (a) permitted New

Source to make cash distributions up to $6 million per year to holders of certain equity interests in the Partnership; (b) amended the terms of a consent letter dated April 8, 2015, among all parties to the Credit Agreement, to postpone the redetermination of the borrowing base under New Source's credit facility from May 1, 2015 to May 8, 2015; (c) made null and void the waiver contained in the seventh amendment to the Credit Agreement, which had permitted New Source to make certain cash distributions to the holders of its common units that were not otherwise permitted by the Credit Agreement; and (d) imposed certain hedging requirements for New Source's oil and natural gas assets if New Source unwound any hedges then in existence prior to the October 2015 redetermination date.

49. The Prospectus specified that the distributions on the Series A Preferred Units would be paid in accordance with clause (a) above, and that New Source expected that the borrowing base under its credit facility would be reduced by approximately $24 million to approximately $60 million on May 8, 2015. The Prospectus did not disclose, however, that New Source's cash flow problems had become so severe that it was inevitable that, by the time of the semi-annual fall redetermination of the credit facility in October 2015, the Partnership would experience a borrowing base deficiency so severe as to jeopardize New Source as a going concern.

50. In fact, at the time New Source filed the Prospectus, New Source was suffering from severe cash flow constraints, such that a downtick in oil prices would likely put it on the brink of insolvency. Nevertheless, the risk factors set forth in the Prospectus did not disclose the severity of New Source's cash flow and other financial troubles.

51. Though not disclosed in the Prospectus, New Source was already under crippling financial pressure at the time it sold the Series A Preferred Units to Plaintiffs and the Class.

**Troubles with New Dominion Negatively Affected the Partnership's Cash Flows**

52. As revealed in the Tulsa Action, and confirmed by former employees of the Partnership, New Dominion withheld revenues due and owing to New Source during 2014 and early 2015. As New Dominion was the largest source of revenue for the Partnership, this had a significant impact on New Source's cash flows.

53. The dispute arose from the contractual relationship between New Source and New Dominion, whereby New Dominion was appointed Contract Operator with respect to certain oil and gas properties owned, in part, by New Source. Pursuant to this arrangement, New Dominion was contractually required to invoice the working interest owners for the costs of operation, in according with the Participation Agreements and/or Joint Operating Agreements to which New Source and New Dominion were parties (the "Agreements").

54. The verified petition filed by New Source in connection with the Tulsa Action (the "Verified Petition") stated that, as a result of New Dominion's refusal to pay New Source its *pro rata* share of revenues under the terms of the Agreements, New Dominion "has caused, and will continue to cause, significant harm" to the Partnership, including, but not limited to, the following:

(a) New Source had not received certain revenue due and owing from New Dominion related to exploration and production operations at various times in 2014 and early 2015, which had materially restricted New Source's cash flow. This disruption in cash flow significantly jeopardized New Source's ability to make distributions on its common units and debt service payments.

(b) New Source's revolving credit facility borrowing base was set to be re-determined on or around March 31, 2015, and was reduced to approximately $84 million from its prior level

of $90 million. Such re-determination required New Source to repay overdrawn amounts, beginning with thirty days receipt of notice of the re-determined borrowing base. (New Source's ability to pay its quarterly distribution was jeopardized if it borrowed in excess of 90% of the re-determined borrowing base.)

(c) Distributions to New Source's common unitholders with respect to the quarter ended March 31, 2015 were subject to New Source's ability to pay down amounts outstanding under its credit facility. Due, at least in part, to the actions of New Dominion, New Source was unsure whether it would have adequate cash available to make its quarterly distributions, which could have resulted in a significant decline to the price of its common units. Indeed, New Source reported, on May 1, 2015, that the Board had not yet declared a common unitholder distribution.

(d) To refinance its credit facility, New Source was required to demonstrate the ability to repay its debt. New Dominion's withholding of revenue due and owing to New Source jeopardized New Source's ability to obtain refinancing, which could lead to the foreclosure of New Source's oil and gas assets.

55. New Source further alleged that New Dominion was in "such a financial precarious position that [New Source would] have no recourse against it for monetary damages." As a result of New Dominion's predicted failure to pay the withheld revenue, New Source expected "[t]he damage to [the Partnership] to be catastrophic, including interference with [New Source]'s ability to continue as a going-concern."

56. According to Confidential Witness No. 1 ("CW1"), a former senior manager who worked at New Source from early 2015 to late 2015 and reported to a VP of Accounting,[1] the

[1] Plaintiffs are not including the Confidential Witnesses' real names in order to protect their privacy and avoid potential retribution. Plaintiffs will provide defendants the names of the Confidential Witnesses promptly upon defendants' execution of an acceptable confidentiality stipulation and protective order.

withholding of revenue by New Dominion caused the Partnership's exploration and production segment to be unable to pay its bills. As a result, New Source was forced to use revenue from the oil services side of its business to cover these obligations, albeit increasingly late. Although New Source typically paid its bills within 30 days, after New Dominion began withholding revenue, the Partnership was generally between 60 and 120 days late in paying its bills.

57. Indeed, according to Confidential Witness No. 2 ("CW2"), a former accountant who worked at New Source from early 2015 to early 2016 and reported to a VP of Accounting, at the time the Prospectus was filed, the Partnership was using loans and "cushion accounts" to pay some of its bills.

58. As early as November 2014, however, New Source had stopped paying some of its bills entirely. Confidential Witness No. 3 ("CW3"), a senior manager at Quorum Business Solutions ("Quorum"), which was hired by New Source for a software transition project, disclosed that New Source stopped paying Quorum after the October 2014 invoice. (CW3 was the project manager on the New Source project from late 2014 to mid-2015.) When CW3 inquired about payment, CW3 was told by employees of New Source that New Dominion was withholding revenue from the Partnership, which made it difficult for New Source to pay bills.

59. Rather than disclose the severe cash flow problems identified in the Tulsa Action and amplified by the confidential witnesses, in an attempt to place the Partnership in a positive light, New Source in the Prospectus instead falsely touted that its preliminary business objective was to "generate stable cash flows, allowing [the Partnership] to make quarterly cash distributions to [its] unitholders, and over time, to increase those quarterly distributions." Prospectus at S-3. This statement was entirely misleading because, at the time the Prospectus was filed, New Source was already experiencing significant disruptions in cash flow, at least in

part as a result of actions allegedly taken by New Dominion, and was being negatively affected by volatility in the oil market, exacerbated by the Partnership's severe cash flow problems.

60. The Prospectus also provided historical financial data, which showed dramatic increases in net cash provided by operating activities since the Partnership was formed in 2012. Moreover, the Partnership touted the reliability of Adjusted EBITDA as a way for investors to measure the Partnership's ability to meet its debt service requirements. This figure had also increased year-over-year from the end of fiscal 2013 to the end of fiscal 2014.

61. In light of the significant problems that New Source was experiencing with respect to its cash flows during the first quarter of fiscal 2015, its summary of historical financial data was misleading because it lacked clear disclosures about the severe curtailment to cash flows, which could materially alter projected financial trends.

62. In spite of the "catastrophic" state of the Partnership's business, as described in pleadings filed in connection with the Tulsa Action, the Prospectus contained only a boilerplate list of risk factors including, without limitation, that:

(a) New Source had to continue to generate cash from operations in order to pay distributions on the Series A Preferred Units. *See* Prospectus at S-16.

(b) The amount of cash New Source generated from operations depended on, among other things:

- the amount of oil, natural gas and NGLs it produced;
- the prices at which it sold its oil, natural gas and NGL production;
- the amount and timing of settlements of its commodity derivatives;
- the level of its operating costs, including maintenance capital expenditures and payments to its general partner; and

- the level of its interest expense, which depended on the amount of its indebtedness and the interest payable thereon. *See* Prospectus at S-16.

(c) The terms of New Source's revolving credit facility and other financing agreements may limit the Partnership's ability to pay distributions on the Series A Preferred Units. *See* Prospectus at S-19.

63. Each of the foregoing representations was materially misleading and/or omitted to state material facts necessary to make the representations not misleading. In particular, the first risk factor mentioned by New Source – that it must continue to generate cash from operations in order to pay distributions on the Series A Preferred Units – completely omitted that the Partnership was already experiencing significant problems doing just that, and that New Source was unlikely to generate sufficient cash flows for the foreseeable future because of revenue withheld by New Dominion, volatility in the oil market, and the vulnerability of the already financially fragile Partnership to fluctuations in the oil market.

64. Additionally, while New Source stated that the amount of cash the Partnership generated from operations depended on, among other things: the amount of oil, natural gas, and NGLs produced; the prices at which New Source sells its oil, natural gas, and NGLs; the amount and timing of settlements of commodity derivatives; the level of operating costs; and the level of interest expenses, the Prospectus completely failed to disclose the dispute New Source had been having with New Dominion, which had already been affecting the Partnership's ability to generate cash from operations, and would be likely to have a materially negative effect on New Source's viability. *See* Prospectus at S-16.

65. Moreover, during this time, oil prices were continuing to decline, adding to the risk that the Partnership would not be able to generate enough cash from operations to allow it to make distributions to holders of the Series A Preferred Units.

66. Continuing to downplay the risks of the Series A Preferred Units, the Prospectus stated that New Source "may not have the funds" to fulfill its obligation to redeem all of the Series A Preferred Units on July 15, 2022 (the "term redemption date"), and that it may not have had the ability to refinance these obligations. The Prospectus omitted to state, however, that New Source would likely not be able to even make quarterly dividend payments on the Series A Preferred Units in the near future, as a result of significant instability in the oil market and the millions of dollars in revenues that were being withheld by New Dominion at the time. *See* Prospectus at S-21 & S-22.

**<u>The Partnership's Disclosures in Other Public Statements</u>**

67. The boilerplate disclosures in the Prospectus were largely copied verbatim from the Form 10-K for fiscal 2014 that was filed with the SEC on March 20, 2015 (the "2014 10-K"). Unlike the Prospectus, however, the 2014 10-K stated that, "in the fourth quarter of 2014 and continuing into 2015, oil and natural gas prices [had] declined significantly, which…cause[d] a reduction in [New Source's] revenue from…oil, natural gas and NGL production at the end of 2014," and was expected to continue into 2015. Additionally, the 2014 10-K stated that "lower oil and natural gas prices impact[ed] the amount of oil, natural gas and NGL that [New Source could] produce economically." *See* 2014 10-K at 12.

68. Even these disclaimers, however, understated New Source's distinct vulnerability to the toxic combination of a decline in oil prices and already-existing cash flow problems (as shown when oil prices began to recover around late August 2015 and New Source continued to

decline, both in the price of its common stock and the Series A Preferred Units). Thus, in spite of the disclaimers, the 2014 10-K, which was incorporated by reference into the Prospectus, omitted material information necessary to make these disclosures not misleading. In particular, the Prospectus and the 2014 10-K failed to disclose that New Source's cash flows from operations were in such a precarious state that further declines in oil prices could make the securities offered nearly worthless.

69. The 2014 10-K also disclosed the existence of the Chernicky Litigation and while it stated, in generic terms, that the Partnership was "currently engaged in litigation with [its] contract operator and its affiliates, which ha[d] affected [its] exploration and production related cash flow," it nonetheless stated:

> While the results of litigation and claims cannot be predicted with certainty, the Partnership believes the reasonably possible losses of such matters, individually and in the aggregate, are not material. Additionally, the Partnership believes the probable final outcome of such matters will not have a material adverse effect on the Partnership's consolidated financial position, results of operations, cash flow or liquidity.

70. Less than two weeks later, however, when New Source filed the Tulsa Action, the Partnership took quite a different stance with respect to the materiality of the issues underlying the New Dominion litigation, alleging quite vehemently that the difficulties with New Dominion had already "significantly impacted [New Source]'s cash flow," and that "[t]he damage to [the Partnership was] expected to be catastrophic, including interference with [New Source]'s ability to continue as a going-concern." No such disclosure appeared anywhere in the Prospectus, nor was the original litigation discussion in the 2014 10-K amplified in the Prospectus with material details of the Chernicky Litigation or updated to reflect material details of the Tulsa Action.

71. Moreover, while the Prospectus included only preliminary results for the first quarter of fiscal 2015, on May 11, 2015, just four days after the Prospectus was filed with the

SEC, New Source filed its Form 10-Q for the quarter ended March 31, 2015 ("First Quarter 2015 10-Q"). The First Quarter 2015 10-Q reported that:

> …on January 29, 2015, the Partnership received notice from New Dominion that it had purchased from NSEC certain obligations claimed to be owed by the Partnership to NSEC. The total amount of the purported claims totaled approximately $1.9 million. In 2015, New Dominion has withheld all revenue from the Partnership's sold oil and natural gas production in satisfaction of these claims as well as other amounts that the Partnership has disputed.

72. The First Quarter 2015 10-Q also reported that New Source was engaged in litigation with New Dominion and its affiliates (both the Tulsa Action and an earlier one filed in January 2015 by New Dominion against New Source), which was affecting its exploration and production related cash flow. None of these facts were disclosed in the Prospectus, which had been filed with the SEC only days before the First Quarter 2015 10-Q was filed.

73. On June 4, 2015, New Source filed a first amended verified petition in connection with the Tulsa Action (the "Amended Petition"). The amended Petition, among other things, alleged that "[a]s a result of the various acts of Defendants described herein, Plaintiff has suffered damages in excess of $150 million and will continue to suffer significant additional damages."

74. Though the magnitude of the damages caused by the acts allegedly taken by New Dominion was evident only a month earlier, when New Source filed the Prospectus, the Prospectus did not even disclose the existence of the lawsuits.

**<u>The Truth Begins to Trickle Out</u>**

75. On July 29, 2015, New Source announced that it was suspending the quarterly cash dividend to common unitholders. Defendant Kos cited the "continued low commodity price environment coupled with current market conditions" as the impetus for the suspension. Defendant Kos further stated that "[p]reservation of this capital allow[ed] the Partnership to

focus on executing [its] plan to restructure the business and position the Partnership for growth," and that New Source would "continue to analyze accretive acquisitions to grow the E&P business while [it] explore[d] the best opportunity to execute [its] restructuring plan to deliver value" to the Partnership's unitholders.

76. On this news, the price of the Series A Preferred Units dropped to $13.10, and Janney downgraded New Source from "buy" to "neutral."

77. Only a week later, on August 8, 2015, New Source reported its earnings for the second quarter of fiscal 2015. The Partnership reported a loss of $111 million, after reporting a profit in the same period a year earlier, and warned that it could have difficulty covering its financial obligations over the next twelve months.

78. The Partnership even went so far as to include a "going concern" statement in its quarterly earnings release, pointing out that it had violated debt covenants on some of its oilfield service related debt. As a result, the Partnership could have to pay the money back sooner than expected, though New Source stated that there could "be no assurance that the [P]artnership [would] be successful in these efforts or that it [would] have sufficient funds to cover its operational and financial obligations over the next twelve months."

79. Analysts at Janney observed that the Partnership's guidance for the second quarter of fiscal 2015 implied "notably lower expectations versus what was implied in its 2015 guidance given in May," and noted a significant reduction in EBITDA for New Source's oilfield services segment, which implied a "50% reduction in 2H15 expectations for the segment versus what was expected only just three months ago."

80. Janney also discussed the Partnership's disclosure that it had "violated debt covenants on debt tied to its oilfield services business," noting that, while it was unclear whether

lenders would call for early repayment of the oilfield services debt, it was likely that the credit facility would be reduced further around October during the Fall re-determination, a scenario that would require New Source to attempt to raise additional capital. Analysts also expressed the opinion that the Partnership's violation of debt covenants was "likely the driver behind the recent suspension of the distribution."

81. Although these significant losses were looming at the time it filed its Prospectus with the SEC, no such statements were made in the Prospectus, and Defendants continued to downplay concerns during a conference call with analysts, again citing a "downturn in the industry" as a reason for the negative results posted by the Partnership in the second quarter of fiscal 2015.

82. On the news of the tremendous loss of $111 million during the second quarter of fiscal 2015, Baird downgraded units in New Source from a "buy" to a "hold."

83. As New Source continued to deteriorate, on September 9, 2015, the Partnership announced that the NYSE had decided to commence proceedings to delist the Partnership's common units from the exchange, due to its failure to maintain an average global market capitalization over a consecutive 30 trading-day period of at least $15 million.

84. New Source also announced that the Partnership received notice from the NYSE of the failure of the Partnership's common equity to meet the NYSE continued listing standard that requires the average closing price of a listed company's common equity to be above $1.00 per unit based on a period of 30 consecutive trading days.

85. On September 28, 2015, New Source announced that, due to a pending borrowing base deficiency under its revolving credit facility, it would not be paying the previously-declared quarterly cash distribution on its Series A Cumulative Preferred Units. On this news, the value

of the Series A Preferred Units made a sharp drop, and Wunderlich lowered the price target from $1.00 to $0.00 based on expectations of the borrowing base redetermination proving to be worse than expected, increased liquidity concerns, and the ongoing litigation with New Dominion.

86. Analysts did not see any clear path for liquidity and associated value that could enable New Source to pay the cumulative preferred distribution on the Series A Preferred Units in October. Based on the Partnership's announcement of the larger-than-expected reduction in its borrowing base, analysts expected that New Source would be overdrawn by $16-$18 million.

87. On September 29, 2015, Baird downgraded shares of New Source from a "neutral" rating to an "underperform" rating, and Wunderlich downgraded shares of New Source from a "hold" rating to a "sell" rating. On October 13, 2015, Zacks downgraded the Partnership from a "hold" rating to a "strong sell" rating. As of Fall 2015, New Source had an average rating of "sell."

88. While the offering price on the Series A Preferred Units was $25.00 per unit, as a result of the revelation of the previously undisclosed cash flow and other related problems, the Series A Preferred Units are now essentially worthless.

**<u>The Underwriters' Violations of the Securities Act</u>**

89. Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

90. Section 12 of the Securities Act provides that any person who "offers or sells a security [...] by means of a prospectus or oral communication, which includes an untrue statement of a material fact" or omission of a material fact is liable. 15 U.S.C. § 77l(a)(2).

91. The Underwriter Defendants offered or sold New Source securities. The Prospectus indicated that New Source engaged Stifel, Baird, Janney, Oppenheimer, and Wunderlich as underwriters to conduct the Offering.

92. Both Section 11 and Section 12 provide that underwriters are liable for damages resulting from materially false misstatements contained in the Offering Documents.

93. It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. Goldman Sachs, *Report of the Business Standards Committee, January 2011*, at 13, *available at* <http://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf> (last visited June 20, 2016). Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*.

94. As gatekeepers, underwriters must *independently* verify all material facts in offering documents. To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process. In other words, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

95. It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

96. It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all

material information is included in the offering documents (in this case the Registration Statement and Prospectus for the May 2015 financing for New Source) and that no material information is omitted that is needed to make the information provided therein not misleading.

97. In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers." Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, the investment bank Goldman Sachs published the *Report of the Business Standards Committee*, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." *Id.* Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*. at 14.

98. In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (Emphasis added). Regulation of Securities Offerings, SEC

Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriter Defendants here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement and Prospectus. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriter Defendants had this role and duty in underwriting the Series A Preferred Units of New Source. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

99. Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the Prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided. If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing. When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading. This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

100. The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditors opinion at face value. The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information

concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

101. An issuer's financial health, including the issuer's total assets and whether the issuer was embroiled in lawsuits, are all material facts requiring inquiry and independent verification by underwriters. With respect to the importance of performing a reasonable due diligence investigation in regard to an issuer's financial condition, which investigation would clearly include such things as the appropriate checking of litigation involving the issuer, it is accepted practice within the investment banking community that the statements by the issuer about its own financial condition are not accepted by the investment bank at face value without adequately questioning the company's auditors and its accounting and financial officers, as well as independently verifying information with third parties.

102. Any reasonable due diligence investigation by an investment bank should include extensive and thorough interviews with both a company's chief financial officer and its auditor – separately, and not together, or in addition to being together. All areas of concern that an auditor may have about the company and/or its accounting decisions should be discussed, with follow-up questioning if deemed necessary.

103. Here, proper due diligence would have required the underwriters to, *inter alia*, inquire and independently verify New Source's financial condition, and perform a litigation check to see if New Source was involved in any lawsuits and/or judgments. The Underwriter Defendants did not conduct anything close to a reasonable due diligence investigation in regard to the May 2015 Offering of New Source's Series A Preferred Units to investors.

104. Moreover, it is an absolute requirement for due diligence in a stock offering that the underwriter conduct a public records search to ensure that there are no undisclosed lawsuits,

judgments, or liens concerning the issuer. Had the Underwriter Defendants done such a public records search, it would have discovered the details of New Source's lawsuit against New Dominion and, in following up with the issuer, realized that New Source's financial health was in shambles.

105. The Underwriter Defendants' due diligence investigation of New Source, if in fact any actual due diligence was performed, failed to uncover, among other things, that New Source was suffering from severe cash flow constraints as a result of New Dominion's withholding of revenue due to New Source, and the details and import of the New Dominion lawsuits. Any reasonable due diligence investigation would have uncovered these very important facts.

106. As a result of the Underwriter Defendants' not performing a reasonable due diligence investigation and/or not performing any due diligence investigation, the Prospectus misrepresented material information and omitted material information, rendering it misleading.

## CLASS ACTION ALLEGATIONS

107. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b), individually and on behalf of all those who purchased Series A Preferred Units from New Source pursuant and/or traceable to the Offering (the "Class"). Excluded from the Class are: Defendants herein; members of the immediate family of each of the Defendants; any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party. Also excluded from the Class are persons who have a net profit in purchases and sales of New Source Series A Preferred Units or otherwise suffered no compensable damages under the securities laws.

108. This action is properly maintainable as a class action because, *inter alia*:

(a) The Class is so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiffs at this time and will be ascertained through appropriate discovery, according to the Prospectus, New Source sold more than 1,760,000 Series A Preferred Units. As such, Plaintiffs believe there are hundreds, if not thousands, of members of the Class;

(b) There are questions of law and fact that are common to the Class including, but not limited to, the following:

i. Whether Defendants violated the Securities Act;

ii. Whether Defendants participated in and pursued the wrongful activities complained of herein;

iii. Whether the Prospectus and Registration Statement issued in connection with the Offering were materially false and misleading or omitted to state material facts concerning the financial effects of litigation with New Dominion and/or the business, finances, and prospects of New Source;

iv. Whether the Individual Defendants and the Underwriter Defendants exercised due diligence in connection with the Offering;

v. Whether Defendants acted with due care in misrepresenting or omitting to state material information concerning New Source; and

vi. The extent of damages sustained by members of the Class and the appropriate measure of damages.

(c) Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to those of the other members of the Class;

(d) Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(e) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g) The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. There will be no difficulty in managing this action as a class action.

**COUNT I**

**(Violation of Section 11 of the Securities Act Against All Defendants)**

109. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

110. Defendants offered and sold New Source securities to the investing public pursuant to the Prospectus that was disseminated to the public and filed with the SEC in connection with the Offering.

111. The Prospectus, at the time it became effective, was inaccurate and misleading, contained untrue statements of material fact, and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading as described above.

112. As the issuer of the Series A Preferred Units, New Source is liable under Section 11 of the Securities Act for the inaccurate and misleading statements contained in the Prospectus (including the documents incorporated by reference therein). Each of the remaining Defendants signed the Prospectus; was a director of New Source, or person performing similar functions, at the time of the filing of the Prospectus; underwrote the securities sold in the Offering; and/or was a controlling person of the Partnership within the meaning of Section 15 of the Securities Act. Consequently, said Defendants are liable for the inaccurate and misleading statements contained in the Prospectus under Sections 11 and 15 of the Securities Act.

113. None of the Individual Defendants or the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true or that there was no omission of material facts required to be stated therein or necessary to make the statements made therein not misleading.

114. This action was brought within one year after the discovery of the untrue statements and omissions, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the securities were bona fide offered to the public. The earliest date by which discovery of the untrue statements and omissions could have been made in the exercise of reasonable diligence was July 29, 2015.

115. Plaintiffs and the other members of the Class purchased or otherwise acquired their Series A Preferred Units without knowledge of the untruths or omissions alleged herein. Plaintiffs and the other members of the Class were thus damaged by Defendants' misconduct,

and by the material misstatements and omissions contained in the Prospectus. By reason of the foregoing, Defendants have violated Section 11 of the Securities Act.

**COUNT II**

**(Violation of Section 12(a)(2) of the Securities Act Against All Defendants)**

116. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

117. Defendants were sellers, offerors, and/or solicitors of purchasers of the Series A Preferred Units offered pursuant to the Prospectus.

118. By means of the Prospectus, and by using the means and instrumentalities of transportation and communication in interstate commerce and of the mails, Defendants offered and sold the Series A Preferred Units to Plaintiffs and the other members of the Class.

119. Each of the Defendants, in order to serve his or its own financial interests or those of the Partnership, sold and/or solicited the sale of the Series A Preferred Units to Plaintiffs and the other members of the Class. As specified previously herein, the Prospectus included untrue statements of material fact and omitted to state material facts necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

120. Neither Plaintiffs nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies, and omissions contained in the Prospectus at the time they purchased the Series A Preferred Units.

121. This action was brought within one year after the discovery of the omissions and misstatements contained in the Prospectus, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the sale of the Series A Preferred Units. The earliest date by which discovery of the omissions and misstatements could have been made in the exercise of reasonable diligence was July 29, 2015.

122. By virtue of the foregoing, Defendants have violated Section 12(a)(2) of the Securities Act and Plaintiffs and the other members of the Class have sustained damages.

123. Plaintiff and the other members of the Class hereby tender their Series A Preferred Units and seek consideration paid therefore with interest thereon, or seek damages to the extent permitted by law.

**COUNT III**

**(Violation of Section 15 of the Securities Act Against the Individual Defendants)**

124. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

125. Each of the Individual Defendants was a control person of New Source by virtue of his position as a director and/or senior officer of New Source. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of New Source.

126. Each of the Individual Defendants was a culpable participant in the violation of Section 11 of the Securities Act, alleged in Count I above, based on their having participated in the preparation of the Prospectus and having otherwise participated in the process that allowed the Offering to be successfully completed.

127. This action was brought within one year after the discovery of the omissions and misstatements contained in the Prospectus, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the sale of the Series A Preferred Units. The earliest date by which discovery of the omissions and misstatements could have been made in the exercise of reasonable diligence was July 29, 2015.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23;

B. Awarding damages, together with interest thereon, against each Defendant and in favor of Plaintiffs and the members of the Class in an amount determined to have been sustained by them;

C. Awarding Plaintiffs and members of the Class punitive and exemplary damages as appropriate, as well as pre-judgment and post-judgment interest at the maximum rate allowable by law;

D. Awarding Plaintiffs and the members of the Class rescission on their Section 12(a)(2) claims, to the extent they still hold their Series A Preferred Units;

E. Imposing a constructive trust upon the proceeds of the Offering and any profits earned thereon;

F. Awarding Plaintiffs and the other members of the Class the costs and expenses of this litigation, including reasonable attorneys' fees, experts' fees, and other costs and disbursements; and

G. Awarding Plaintiffs and the other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
June 20, 2016

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: /s/ *Peter C. Harrar*
Peter C. Harrar
Correy A. Kamin

270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
Fax: 212-686-0114
harrar@whafh.com
kamin@whafh.com

-and-

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Yu Shi
275 Madison Avenue, 34th Floor
New York, NY 10016
Tel.: 212-686-1060
Fax: 212-202-3827
pkim@rosenlegal.com
yshi@rosenlegal.com

***Co-Lead Counsel for Plaintiffs***