**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ENRICO VACCARO, F. GREGORY DENEEN, and WILLIAM SLATER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NEW SOURCE ENERGY PARTNERS L.P., KRISTIAN B. KOS, TERRY L. TOOLE, DIKRAN TOURIAN, RICHARD D. FINLEY, V. BRUCE THOMPSON, JOHN A. RABER, STIFEL, NICOLAUS & COMPANY, INC., ROBERT W. BAIRD & CO. INC., JANNEY MONTGOMERY SCOTT LLC, OPPENHEIMER & CO. INC., and WUNDERLICH SECURITIES, INC.,<br><br>Defendants. | Civil Action No. 1:15-cv-08954 (KMW)<br><br>Hon. Kimba M. Wood |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Enrico Vaccaro, F. Gregory Deneen, and William Slater ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, for their Second Amended Class Action Complaint, allege upon personal knowledge as to themselves, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through their attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings made by New Source Energy Partners L.P. ("New Source" or the "Partnership"), press releases and media reports published by and regarding New Source, analysts' reports and advisories about the Partnership, publicly-available oil and gas industry data, the docket in a lawsuit filed by New Source against one of its contract operators,

New Dominion LLC ("New Dominion") (*New Source Energy Partners LP v. New Dominion LLC*, Tulsa County Case No. CJ-2015-1239 (the "Tulsa Action")), and other publicly-available information concerning New Source, as well as interviews of confidential witnesses, as follows:

## SUMMARY OF ACTION

1. This action arises from the materially false and misleading Registration Statement (defined below) and Prospectus (defined below) issued in connection with New Source's May 2015 offering (the "Offering") of its 11% Series A Cumulative Convertible Preferred Units ("Series A Preferred Units"). The Registration Statement and Prospectus contained materially false and misleading statements, and omitted to state material information necessary to make the statements made therein not misleading, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

2. The Series A Preferred Unit Offering, which closed on May 8, 2015, was conducted pursuant to a prospectus supplement dated May 5, 2015. The prospectus supplement, after describing the restoration of fiscal soundness to be achieved by using the proceeds of the Offering to repay indebtedness outstanding under the Partnership's revolving credit facility, touted New Source's "organic expansion plans" and pursuit of accretive acquisitions. On June 4, 2015, a mere 27 days after the Offering, the Partnership for the first time disclosed in a legal filing that it had for some time curtailed the drilling of new wells because its contract operator was no longer deemed to be sufficiently reliable to drill wells for the Partnership. New Source also disclosed for the first time in this legal filing that it had suffered, from the utter incompetence and fraudulent conduct of its contract operator, damages traceable back to 2013 and 2014 in excess of $150 million – more than the market capitalization of the entire Partnership.

3. Less than three months after the Offering, on July 29, 2015, the Partnership announced a suspension of quarterly common dividend payments and revealed the existence of a restructuring plan not alluded to in any of the documents disseminated in connection with the Offering. On August 10, 2015, the Partnership, in a press release announcing second quarter results, expressed "substantial doubt as to its ability to continue as a going concern", in large part "[a]s a result of the substantial drop in oil, natural gas and NGL prices," even though, as alleged herein, prices in the domestic oil and gas markets had remained relatively stable in the approximately 14 weeks after the Offering. In fact, the oil and gas prices reported by the Partnership in its second quarter 2015 earnings release had actually ***increased*** quarter over quarter. As described herein, in light of the relative stability of macroeconomic market conditions, the undisclosed, company-specific problems New Source began to slowly and belatedly reveal with the July 29 and August 10, 2015 announcements were either in in existence or substantially likely to occur at the time of the Offering, rendering the registration statement and prospectus materially false and misleading as of the effective date of the Offering.

4. New Source was formed in October 2012 to acquire and own oil and natural gas properties in the United States. New Source operated in two segments: (a) exploration and production ("E&P"); and (b) oilfield services. It was engaged in the development and production of onshore oil and natural gas properties that extend across conventional resource reservoirs in east-central Oklahoma. Its oil and natural gas properties consisted of non-operated working interests, primarily in the Misener-Hunton Formation.

5. In addition, New Source was engaged in oilfield services through its oilfield services subsidiaries. Its oilfield business provided well site services during the drilling and completion stages of a well, including full service blowout prevention installation and pressure

testing services, to the oil and natural gas industry, primarily in Oklahoma, Texas, New Mexico, Kansas, Pennsylvania, Ohio, and West Virginia.

6. In February 2013, the Partnership completed a public offering of 4,000,000 common units representing limited partner interests in the Partnership at a price of $20.00 per common unit (the "IPO"). In connection with the closing of the IPO, the Partnership entered into a development agreement with New Source Energy Corporation ("NSEC"), an independent energy company engaged in the development and production of onshore oil and liquids-rich natural gas projects in the United States, and New Dominion, a company that operates hundreds of oil and natural gas wells throughout central Oklahoma.

7. As described herein, and inadequately disclosed and discussed in the Offering Documents (defined below), New Source was, at the time of the Offering, caught up in litigation with New Dominion. The unreliability of its contract operator had severely curtailed New Source's drilling operations and put it in a precarious financial and operational condition that would not be remedied absent replacement of the contract operator, a corporate restructuring transaction, and a substantial uptick in the oil and gas market.

8. Mired in litigation, starving for cash and concerned about its ability to continue as a going concern, New Source decided to offer securities via shelf takedown, pursuant to a registration statement filed with the SEC a year earlier.

9. On April 21, 2014, New Source had filed with the SEC a base prospectus and shelf registration statement on Form S-3 (the "Registration Statement"). With this Registration Statement in place, New Source would be able to quickly access the capital markets without SEC staff review or delay.

10. Pursuant to the Registration Statement, on May 4, 2015, New Source announced the Offering, consisting of approximately $40 million of its Series A Preferred Units. This shelf takedown was offered with the prospectus and accompanying prospectus supplement, both dated May 5, 2015 and filed with the SEC on May 7, 2015 (collectively, the "Prospectus") (together, the Prospectus and the Registration Statement are hereinafter referred to as the "Offering Documents").

11. New Source stated that it expected to receive net proceeds of approximately $40.4 million from the Offering, which it purportedly intended to use in order to repay a portion of the indebtedness outstanding under its credit facility. In the process of attempting to prop up its faltering finances and secure its future, however, the Partnership misrepresented the true state of its financial and operational condition and failed to disclose material information regarding the immediate future of New Source.

12. Although SEC regulations required New Source to ensure that purchasers of the Series A Preferred Units had information that was accurate as of the date the units were sold, the Partnership failed to amend the Prospectus to reflect any facts or events arising after the effective date of the Registration Statement – facts that, individually and in the aggregate, represented a fundamental change in the information set forth in the Registration Statement. As such, this class action is filed on behalf of all persons and/or entities that purchased or otherwise acquired Series A Preferred Units pursuant to and/or traceable to the Offering Documents, and were damaged thereby.

## JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act.

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 21D of the Securities Act.

15. Venue is proper in this District pursuant to Section 21D of the Securities Act and 28 U.S.C. §1391(b), because many of the acts and practices complained of herein occurred in this District, including the dissemination of material false and misleading statements complained of herein into this District. In addition, the Underwriter Defendants (as defined below) either maintain their principal places of business in this District and/or are registered to do business in this District.

16. In connection with the acts, conduct, and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets, including the New York Stock Exchange ("NYSE").

## PARTIES

17. Plaintiff Enrico Vaccaro ("Vaccaro") purchased and/or acquired 1,750 New Source Series A Preferred Units on May 5, 2015, pursuant and/or traceable to the Prospectus, and was damaged thereby. Mr. Vaccaro purchased his units directly from Defendant Janney Montgomery Scott LLC.

18. Plaintiff F. Gregory Deneen ("Deneen") purchased and/or acquired 3,000 New Source Series A Preferred Units on May 5, 2015, pursuant and/or traceable to the Prospectus, and was damaged thereby. Mr. Deneen purchased his units directly from Defendant Robert W. Baird & Co. Inc.

19. Plaintiff William Slater ("Slater") purchased and/or acquired 1,000 New Source Series A Preferred Units on May 5, 2015, pursuant and/or traceable to the Prospectus, and was

damaged thereby. Mr. Slater purchased his shares directly from Defendant Stifel, Nicolaus & Company, Inc.

20. Defendant New Source is a Delaware limited partnership formed in October 2012 to own and acquire natural gas properties in the United States. Its general partner, New Source Energy GP, LLC ("New Source GP"), managed the operations and activities of New Source. The Partnership's principal executive offices are located at 914 North Broadway, Suite 230, Oklahoma City, Oklahoma 73102. On March 15, 2016, New Source GP and New Source filed voluntary petitions for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). As such, pursuant to section 362(a) of the Bankruptcy Code, this action is stayed as to New Source and New Source GP.

21. Defendant Kristian B. Kos ("Kos") was, at all relevant times, the Chairman of the board of directors (the "Board") and the Chief Executive Officer ("CEO") of New Source. From July 2011 to May 2014, Defendant Kos was the president and CEO of NSEC. Defendant Kos participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC. As of March 6, 2015, 69.4% of New Source's general partner was owned by an entity controlled by Defendant Kos, 5.6% was owned by NSEC, and 25.0% was owned by an entity controlled by David J. Chernicky ("Chernicky"), who also owns 88.9% of NSEC.

22. Defendant Terry L. Toole ("Toole") was, at all relevant times, a director and Chairman of the Audit Committee of the Board. Defendant Toole participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC.

23. Defendant Dikran Tourian ("Tourian") was, at all relevant times, a director and the Chief Operating Officer ("COO") of New Source. Defendant Tourian participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC.

24. Defendant Richard D. Finley ("Finley") was, at all relevant times, the Chief Financial Officer ("CFO") and Treasurer of the Board of New Source. Defendant Finley also served as the CFO and Treasurer of NSEC from August 2011 until May 2014. Defendant Finley participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC. Finley resigned as CFO effective June 30, 2015.

25. Defendant V. Bruce Thompson ("Thompson") was, at all relevant times, a director of New Source. Defendant Thompson participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC.

26. Defendant John A. Raber ("Raber") was, at all relevant times, a director of New Source. Defendant Raber participated in preparing the Prospectus, and signed or authorized the signing of the Registration Statement filed with the SEC.

27. The Defendants listed above, in paragraphs 21 through 26, are collectively referred to herein as the "Individual Defendants."

28. By reason of their management positions and their ability to make public statements in the name of the Partnership, the Individual Defendants were and are controlling persons, and had the power and influence to cause, and did cause, the Partnership to engage in the conduct alleged in this Complaint.

29. By reason of their positions as executive officers and/or directors of New Source, the Individual Defendants were, at all relevant times, controlling persons within the meaning of

Section 15 of the Securities Act. Because of their executive and directorial positions with New Source, the Individual Defendants had access to the adverse and undisclosed information about New Source's business condition and financial results. Further, as particularized herein, the Individual Defendants were able to and did control the contents of the Registration Statement, the Prospectus, and various public statements incorporated by reference therein.

30. Defendant Stifel, Nicolaus & Company, Inc. ("Stifel") served as underwriter to New Source in connection with the Offering. Defendant Stifel participated in the preparation and dissemination of the Prospectus. Defendant Stifel is a wholly-owned subsidiary of Stifel Financial Corp. ("Stifel Financial"), a financial holding company headquartered in St. Louis, Missouri. Stifel Financial's stock trades on the NYSE. Both Stifel and Stifel Financial maintain offices in New York and, pursuant to the New York State Division of Corporations, are authorized to do business in the State of New York.

31. Defendant Robert W. Baird & Co. Inc. ("Baird") served as an underwriter to New Source in connection with the Offering. Defendant Baird participated in the preparation and dissemination of the Prospectus. Defendant Baird maintains offices at 610 5th Avenue, New York, New York 10020 and, pursuant to the New York State Division of Corporations, is authorized to do business in the State of New York.

32. Defendant Janney Montgomery Scott LLC ("Janney") served as an underwriter to New Source in connection with the Offering. Defendant Janney participated in the preparation and dissemination of the Prospectus. Defendant Janney maintains its corporate headquarters at 575 Lexington Avenue, New York, New York 10022.

33. Defendant Oppenheimer & Co., Inc. ("Oppenheimer") served as an underwriter to New Source in connection with the Offering. Defendant Oppenheimer participated in the

preparation and dissemination of the Prospectus. Defendant Oppenheimer maintains its headquarters at 85 Broad Street, New York, New York 10004.

34. Defendant Wunderlich Securities, Inc. ("Wunderlich") served as an underwriter to New Source in connection with the Offering. Defendant Wunderlich participated in the preparation and dissemination of the Prospectus. Defendant Wunderlich maintains multiple offices in New York and, pursuant to the New York State Division of Corporations, is authorized to do business in the State of New York.

35. Stifel, Baird, Janney, Oppenheimer, and Wunderlich served as lead underwriters for the Offering and are collectively referred to herein as the "Underwriter Defendants." New Source, the Individual Defendants, and the Underwriter Defendants, collectively, are referred to herein as "Defendants."

36. Representatives of the Underwriter Defendants also assisted the Partnership and the Individual Defendants in planning the Offering. They also purported to conduct an adequate and reasonable investigation into the business, operations, and plans of the Partnership, an undertaking known as a "due diligence" investigation. Proper due diligence required the Underwriter Defendants to have staffed the deal team with bankers who possessed adequate knowledge of the oil and gas markets in which New Source operated as well as experience working with oil and gas companies. During the course of their due diligence, the Underwriter Defendants had continual access to confidential corporate information concerning the Partnership and its business, financial condition, cash flow, plans, and prospects.

37. The Underwriter Defendants are liable for the materially misleading statements contained in the Prospectus, which were a substantial factor leading to the harm complained of herein. In fact, had any of the Underwriter Defendants conducted even the most minimal due

diligence, they would have discovered that New Source was having serious financial difficulties, and that the Partnership was offering the Series A Preferred Units as a last-ditch effort to keep the Partnership afloat.

38. The Underwriter Defendants received millions of dollars in fees and options to purchase an additional 264,000 Series A Preferred Units in the Offering. In return for this compensation, the Underwriter Defendants were willing to offer the Series A Preferred Units to the investing public on behalf of New Source. In the course of their investigation into New Source, the Underwriter Defendants could and should have discovered the misleading statements and material omissions contained in the Prospectus, as well as the true condition of the business. The Underwriter Defendants were clearly negligent in failing to uncover and disclose these facts.

## SUBSTANTIVE ALLEGATIONS

### Troubles with New Dominion Negatively Affected the Partnership's Financial & Operational Well-Being

39. As of March 6, 2015, 25% of New Source's general partner was owned by an entity controlled by Chernicky, who was also the co-founder and beneficial owner of New Dominion. Chernicky also controlled approximately 90% of the shares of NSEC as of March 2015, and formerly served as Chairman of the Board of New Source and its general partner.

40. Pursuant to the Participation Agreements and Joint Operating Agreements to which New Source and New Dominion were parties, New Dominion was to pay New Source (and certain other working interest owners) their *pro rata* share of production, and invoice the working interest owners for the costs of operation.

41. By early 2015, tensions among Chernicky and the Defendants herein, among others, had escalated to such an extent that New Dominion, NSEC, and Chernicky filed suit against New Source in an Oklahoma State Court (*New Dominion LLC v. New Source Energy*

*Partners LP*, Tulsa County Case No. CJ-2015-00123 (the "Chernicky Litigation")). The suit arose out of alleged misrepresentations made by defendants Kos and Finley in convincing Chernicky to form NSEC and New Source, and ultimately to transfer significant working interests to New Source.

42. As a result of these alleged misrepresentations, according to Chernicky, New Source purportedly improperly acquired working interests, revenue, and property from Chernicky, and subsequently failed to pay its prepayments and joint interest billings in a timely fashion. Chernicky also alleged that defendant Kos, acting on behalf of NSEC and New Source, caused NSEC to convey certain properties to New Source at below market value. In the process, according to Chernicky, liabilities of the NSEC properties that should have been transferred to New Source were left on the books of NSEC.

43. In order to thwart New Source's alleged scheme to obtain revenue from Chernicky's working interests before starving out New Dominion as contract operator by withholding prepayments and joint interest billings, according to Chernicky, NSEC allegedly factored to New Dominion the amounts due and owing to it by New Source.

44. As a countermove to Chernicky's lawsuit, on March 31, 2015, New Source filed the Tulsa Action against New Dominion in the District Court of Tulsa County, alleging that New Dominion had been withholding revenue due and owing to New Source since at least late 2014.

45. As revealed in the Tulsa Action, and confirmed by former employees of the Partnership, New Dominion withheld revenues due and owing to New Source during 2014 and early 2015. As New Dominion was the largest source of revenue for the Partnership, this had a significant impact on New Source's cash flows.

46. The dispute arose from the contractual relationship between New Source and New Dominion, whereby New Dominion was appointed contract operator with respect to certain oil and gas properties owned, in part, by New Source. Pursuant to this arrangement, New Dominion was contractually required to invoice the working interest owners for the costs of operation, in accordance with the participation agreements and/or joint operating agreements to which New Source and New Dominion were parties (the "Operator Agreements").

47. The bare-bones verified petition filed by New Source on March 31, 2015 in connection with the Tulsa Action (the "Verified Petition") stated that, as a result of New Dominion's refusal to pay New Source its *pro rata* share of revenues under the terms of the Operator Agreements, New Dominion "has caused, and will continue to cause, significant harm" to the Partnership, including, but not limited to, the following:

(a) New Source had not received certain revenue due and owing from New Dominion related to exploration and production operations at various times in 2014 and early 2015, which had materially restricted New Source's cash flow. This disruption in cash flow significantly jeopardized New Source's ability to make distributions on its common units and debt service payments.

(b) New Source's revolving credit facility borrowing base was set to be re-determined on or around March 31, 2015, and had been reduced to approximately $84 million from its prior level of $90 million. Such re-determination required New Source to repay overdrawn amounts, beginning within thirty days of receipt of notice of the re-determined borrowing base. (New Source's ability to pay its quarterly distribution was jeopardized if it borrowed in excess of 90% of the re-determined borrowing base.)

(c) Distributions to New Source's common unitholders with respect to the quarter ended March 31, 2015 were subject to New Source's ability to pay down amounts outstanding under its credit facility. Due, at least in part, to the actions of New Dominion, New Source was unsure whether it would have adequate cash available to make its quarterly distributions, which could have resulted in a significant decline to the price of its common units. Indeed, New Source reported, on May 1, 2015, that the Board had not yet declared a common unitholder distribution.

(d) To refinance its credit facility, New Source was required to demonstrate the ability to repay its debt. New Dominion's withholding of revenue due and owing to New Source jeopardized New Source's ability to obtain refinancing, which could lead to the foreclosure of New Source's oil and gas assets.

48. New Source further alleged that New Dominion was in "such a financially precarious position that [New Source would] have no recourse against it for monetary damages." In an attempt to secure a temporary restraining order against New Dominion, New Source claimed, in largely boilerplate language, that it expected "[t]he damage to [the Partnership] to be catastrophic, including interference with [New Source]'s ability to continue as a going-concern." Despite these allegations, the going concern language was not disclosed in any fashion in either the Partnership's 2014 10-K filed earlier that month or in the May 5, 2015 prospectus supplement.

49. The statements in the Verified Petition, many of which were boilerplate language in support of a request for injunctive relief, were reticent with respect to a variety of important factual details, the pre-Offering disclosure of which might have jeopardized the Offering. The Partnership did not disclose those damning and critical underlying facts until after the Offering had been completed.

50. Confidential witnesses provide some additional detail on the underlying facts of the dispute. According to Confidential Witness No. 1 ("CW1"), a former senior manager who worked at New Source from early 2015 to late 2015 and reported to a VP of Accounting,[1] the withholding of revenue by New Dominion caused the Partnership's exploration and production segment to be unable to pay its bills. As a result, New Source was forced to use revenue from the oilfield services side of its business to cover these obligations, albeit increasingly late. Although New Source typically paid its bills within 30 days, after New Dominion began withholding revenue, the Partnership was generally between 60 and 120 days late in paying its bills.

51. Indeed, according to Confidential Witness No. 2 ("CW2"), a former accountant who worked at New Source from early 2015 to early 2016 and reported to a VP of Accounting, at the time the Prospectus was filed, the Partnership was using loans and "cushion accounts" to pay some of its bills.

52. As early as November 2014, however, New Source had stopped paying some of its bills entirely. Confidential Witness No. 3 ("CW3"), a senior manager at Quorum Business Solutions ("Quorum"), which was hired by New Source for a software transition project, disclosed that New Source stopped paying Quorum after the October 2014 invoice. (CW3 was the project manager on the New Source project from late 2014 to mid-2015.) When CW3 inquired about payment, CW3 was told by employees of New Source that New Dominion was withholding revenue from the Partnership, which made it difficult for New Source to pay bills.

[1] Plaintiffs are not including the Confidential Witnesses' real names in order to protect their privacy and avoid potential retribution. Plaintiffs will provide Defendants the names of the Confidential Witnesses promptly upon Defendants' execution of an acceptable confidentiality stipulation and protective order.

53. Once the Partnership had completed the Offering, however, and further detail presented no risk to the marketability of the Offering, New Source began to paint a more graphic and complete picture of its dire financial problems in the amended pleadings filed in the Tulsa Action, newly alleging facts having occurred and knowable at the time of the Offering.

54. On June 4, 2015 (less than one month after the Offering), New Source filed its first amended petition in the Tulsa Action (the "Amended Petition"). The Amended Petition finally set forth what New Source had known for months, in some cases years, but failed to fully disclose in the Offering Documents. For example, New Dominion's incompetent (and allegedly fraudulent) conduct with regard to operation of the Partnership's oil and gas properties had caused more than $150 million dollars in damages to New Source – more than the entire market capitalization of the Partnership at that time.

55. New Source newly described New Dominion's unreasonable and unworkmanlike actions in substantial detail, noting that "[t]hroughout 2013 and 2014, [New Dominion]'s operating costs escalated significantly, and its actions as Operator became increasingly less reasonable and workmanlike, causing [New Source] and other working interest owners to suspend their drilling programs." In the 2014 10-K, however, this suspension was misleadingly blamed on purportedly low commodity prices, while the more profound and lasting cause for suspension in drilling activity – the incompetence, and severe and irremediable lapses in performance, of the Partnership's contract operator – was not mentioned.

56. In addition to improperly withholding revenue owed to New Source during 2014 and throughout 2015, New Dominion had purportedly "committed other flagrant breaches of contract, failed to conduct its activities in a good and workmanlike manner, with due diligence

and dispatch, failed to act in accordance with good oil field practice, and committed acts of gross negligence and willful misconduct as Operator" for ***years*** prior to the Offering.

57. As an independent energy partnership engaged in exploration and production of oil and natural gas properties, suspension of New Source's drilling programs would have a disastrous effect on the Partnership. Without the ability to drill on its properties, New Source would be unable to replace its production or add to its reserves, thereby drastically undermining the value of its assets and putting more pressure on an already financially vulnerable company. Any reasonable investor in an E&P enterprise would have wanted to know that the Partnership had a wholly unreliable contract operator because, without a competent and trustworthy contract operator, a business operating in this space could not develop its assets.

58. Compounding this extraordinary drain on the value of the Partnership's properties was another impending and inevitable reduction to the borrowing base under New Source's credit facility. Although the borrowing base had been reduced only two months earlier, and was scheduled to be further reevaluated in October 2015, the Amended Petition disclosed that the Partnership "will soon be faced with a reduction to the borrowing base under its credit facility, which [would] have to be promptly repaid." This inevitability (as opposed to a scheduled resetting) was neither mentioned in the Verified Petition, nor disclosed in the Offering Documents, though it apparently was the anticipation of another expected and imminent reduction to the borrowing base that was forcing the development of a restructuring plan, as finally admitted in the July 29, 2015 press release.

59. New Source could not have known that this reduction was inevitably forthcoming unless it had been engaged in discussions with its lending banks, yet the Partnership failed to

alert the market in any of the Offering Documents to the substantial likelihood of this additional borrowing base reduction.

60. Before the Amended Petition, the Partnership also failed to disclose – or even give any indication – that, in addition to withholding revenue, its contract operator had defrauded the Partnership and entirely failed "to carry out its duties as a reasonable, prudent operator," thereby causing significant diminution to the value of New Source's assets. If New Source had disclosed in the Offering Documents what it made so abundantly clear in the Amended Petition less than a month later, the Partnership would likely not have been able to raise the capital it so desperately needed to attempt to stave off complete financial ruin.

**The False and Misleading Prospectus**

61. Pursuant to the Prospectus, disseminated a year after the Registration Statement, New Source offered 1,760,000 of its 11.00% Series A Preferred Units at a price of $25.00 per unit. The Prospectus set forth that distributions on the Series A Preferred Units would be payable at an initial rate of 11.00% per annum of the stated liquidation preference of $25.00. As shown herein, the Prospectus was materially false and misleading, failing to disclose New Source's imminent failure as a going concern absent a myriad of things coming together in exactly the right way, at exactly the right time. Even after raising nearly $44 million through the Offering, unbeknownst to the investing public, New Source was still not in a position to save itself unless three things happened: (1) it was able to successfully resolve the severe problems that it was having with the contract operator of its oil and gas assets, either through prevailing in the litigation or effecting the operator's replacement; (2) it executed a restructuring transaction, such as a sale or monetization of its oilfield services division; and (3) commodity prices improved materially.

62. Recognizing the problems inherent in selling securities via a delayed offering pursuant to a shelf registration mechanism, SEC Regulation S-K provides that:

> for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

17 C.F.R. § 229.512(a)(2).

63. In order to ensure that purchasers of these types of securities have accurate information whenever the securities are sold, the SEC requires issuers of shelf-offerings to amend the prospectus "to reflect…any facts or events arising after the effective date of the registration statement…which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement." 17 C.F.R. § 229.512(a)(1)(ii).

64. Without section (a)(2), above, this ongoing reporting requirement would be meaningless, since purchasers who acquired securities in a shelf offering more than three years after the initial registration would find their Section 11 claims barred by the statute of limitations, even if they bought the securities in reliance on a fraudulent, post-effective amendment to the registration. To remedy this problem, § 229.512(a)(2), operating in the context of securities offered pursuant to the post-effective registration, deems the offering date to be the post-effective registration date, not the initial registration date.

65. Therefore, where an offering is made pursuant to a common registration statement, but with an amended prospectus, each such post-effective amendment will be deemed to be a new registration statement relating to the securities offered therein. Because of the unique way that securities are offered under a shelf registration, each new issuance of securities requires amending the registration statement, thereby creating a new registration statement for purposes of giving rise to liability under Section 11. As described herein, the Offering

Documents were woefully inadequate in describing New Source's dire financial and operational condition as of the effective date of the Offering.

66. The Prospectus stated that New Source expected to receive net proceeds of approximately $40.4 million from the Offering, after deducting underwriting discounts and estimated offering expenses, and that New Source intended to use all of the net proceeds from the Offering to repay a portion of the indebtedness outstanding under its credit facility.

67. The Prospectus further stated that, on May 1, 2015, New Source had entered into an eighth amendment to its credit agreement dated as of February 13, 2013, by and among New Source, as borrower, Bank of Montreal, as administrative agent, and various other lenders (the "Credit Agreement"). The eighth amendment to the Credit Agreement: (a) permitted New Source to make cash distributions up to $6 million per year to holders of certain equity interests in the Partnership; (b) amended the terms of a consent letter dated April 8, 2015, among all parties to the Credit Agreement, to postpone the redetermination of the borrowing base under New Source's credit facility from May 1, 2015 to May 8, 2015; (c) made null and void the waiver contained in the seventh amendment to the Credit Agreement, which had permitted New Source to make certain cash distributions to the holders of its common units that were not otherwise permitted by the Credit Agreement; and (d) imposed certain hedging requirements for New Source's oil and natural gas assets if New Source unwound any hedges then in existence prior to the October 2015 redetermination date.

68. The Prospectus specified that the distributions on the Series A Preferred Units would be paid in accordance with clause (a) above, and that New Source expected that the borrowing base under its credit facility would be reduced by approximately $24 million to approximately $60 million on May 8, 2015. New Source intimated that, because the terms of the

Partnership's agreement with its lenders prohibited the Partnership from "declar[ing] or pay[ing] distributions on [its] common equity if the amount of borrowings outstanding under [its] credit facility exceeds $54.0 million[,]" the Partnership had sufficient headroom to continue paying distributions. Unlike the Verified Petition filed less than a month later, the Prospectus did not disclose that, soon after the May 8, 2015 funding, New Source's borrowing base would not merely be redetermined, but would necessarily be ***further*** reduced, thus making imminently likely and bringing to fruition the ruinous financial squeeze that the Prospectus only referred to as an inchoate possibility.

69. Nor did the Prospectus disclose that New Source's financial and operational problems had become so severe that it was inevitable that, by the time of the semi-annual fall redetermination of the credit facility in October 2015, the Partnership would experience a borrowing base deficiency so severe as to jeopardize New Source as a going concern – absent the stars aligning through significant improvement in the overall commodity pricing environment, solving the severe problems with the Partnership's contract operator, and entering into a restructuring transaction, which may have included the sale or other monetization of New Source's oilfield services business.

70. In fact, at the time New Source filed the Prospectus, New Source was suffering from such severe cash flow constraints that, unless the Partnership were able to successfully sell or otherwise monetize its oilfield services division and successfully undergo a restructuring, New Source would have trouble continuing as a going concern. Nevertheless, the risk factors set forth in the Prospectus did not disclose the severity of New Source's cash flow and other financial troubles – likely because such disclosures would have made the Offering untenable and, as such, dashed any hope for the Partnership's already-bleak future.

71. Rather than disclose the severe operational and financial problems cursorily alluded to in the Verified Petition and amplified by the confidential witnesses and the Amended Petition, in an attempt to place the Partnership in a positive light, New Source in the Prospectus instead falsely touted that its preliminary business objective was to "generate stable cash flows, allowing [the Partnership] to make quarterly cash distributions to [its] unitholders, and over time, to increase those quarterly distributions." Prospectus at S-3. In order to achieve these objectives, New Source boasted that it intended to pursue organic expansion of its oilfield services business as well as accretive acquisitions that would "enable [the Partnership] to utilize a strategic or technical advantage based on [its] existing liquidity, operational experience and access to infrastructure." *Id*. at S-4. These statements were misleading because, at the time the Prospectus was filed, New Source was already experiencing significant disruptions in cash flow, including from the curtailment of drilling in the prior two years, at least in part as a result of actions allegedly taken by New Dominion, to the extent that it had voiced unequivocal doubts about its "ability to continue as a going concern." *See* Verified Petition.

72. The Prospectus also provided historical financial data, which showed dramatic increases in net cash provided by operating activities since the Partnership was formed in 2012. Moreover, the Partnership touted the reliability of Adjusted EBITDA as a way for investors to measure the Partnership's ability to meet its debt service requirements. This figure had also increased year-over-year from the end of fiscal 2013 to the end of fiscal 2014. As shown below, that adjusted EBITDA remained steady from the first to the second quarter of the 2015 fiscal year supports the reasonable inference that violation of the Partnership's debt service covenant resulted from a material, undisclosed problem that was already in existence at the time of the Offering.

73. In light of the significant problems that New Source was experiencing with respect to its cash flows during the first quarter of fiscal 2015, its summary of historical financial data was misleading because it lacked clear disclosures about the severe curtailment to cash flows, which could materially alter projected financial trends.

74. In spite of the "catastrophic" state of the Partnership's business, as described in pleadings filed in connection with the Tulsa Action, the Prospectus contained only a boilerplate list of risk factors including, without limitation, that:

(a) New Source had to continue to generate cash from operations in order to pay distributions on the Series A Preferred Units. *See* Prospectus at S-16.

(b) The amount of cash New Source generated from operations depended on, among other things:

- the amount of oil, natural gas and NGLs it produced;
- the prices at which it sold its oil, natural gas and NGL production;
- the amount and timing of settlements of its commodity derivatives;
- the level of its operating costs, including maintenance capital expenditures and payments to its general partner; and
- the level of its interest expense, which depended on the amount of its indebtedness and the interest payable thereon. *See id.* at S-16.

(c) The terms of New Source's revolving credit facility and other financing agreements may limit the Partnership's ability to pay distributions on the Series A Preferred Units. *See id.* at S-19.

75. Each of the foregoing representations was materially misleading and/or omitted to state material facts necessary to make the representations not misleading. In particular, the first

risk factor mentioned by New Source – that it must continue to generate cash from operations in order to pay distributions on the Series A Preferred Units – completely omitted that the Partnership was already experiencing significant problems doing just that, and that New Source was unlikely to generate sufficient cash flows for the foreseeable future because of revenue withheld by New Dominion, an impending reduction in the Partnership's borrowing base prior to the regular autumn redetermination, and the curtailment of drilling – and absent replacement of its contract operator, restructuring transaction(s), and a substantial increase in commodity prices.

76. Additionally, while New Source stated that the amount of cash the Partnership generated from operations depended on, among other things: the amount of oil, natural gas, and NGLs produced; the prices at which New Source sells its oil, natural gas, and NGLs; the amount and timing of settlements of commodity derivatives; the level of operating costs; and the level of interest expenses, (*see id.* at S-16), the Prospectus completely failed to divulge the true nature and materiality of the profound problems New Source had been having with New Dominion, which had already caused severe curtailing of drilling operations, affected the Partnership's ability to generate cash from operations, and would be likely to have a materially negative effect on New Source's viability.

77. For example, the generic disclosure that the amount of cash the Partnership generated from operations depended upon the amount of oil, natural gas, and NGLs produced was entirely misleading because it omitted to state the material fact that, ***since at least 2013***, New Source's contract operator, New Dominion, had been so ineffectual and fraudulent in conducting its business as to cause the Partnership to curtail its drilling at some point prior to the Offering. As described in paragraph 96 below, the Partnership was also experiencing extraordinary drops in production, which resulted in the substantial destruction of the

Partnership's financial stability. These incredibly high rates of decline in hydrocarbon production, combined with a curtailment in drilling, would certainly have altered the total mix of information available to investors, thus requiring disclosure in the Offering Documents.

78. Moreover, as explained further below, macroeconomic factors in the market were relatively stable. Any problems New Source was having with cash flow, therefore, do not appear to have been caused by any purported decline in prices at which the Partnership sold its oil, natural gas, and NGLs. Therefore, the Partnership appears to have been hoping, instead, for substantial increases in commodity prices because, without substantially higher commodity prices, its restructuring plan and replacement of its contract operator would not be enough to save the Partnership.

79. Continuing to render remote in time the risks of the Series A Preferred Units, the Prospectus stated that New Source "may not have the funds" to fulfill its obligation to redeem all of the Series A Preferred Units on July 15, 2022 (the "Term Redemption Date"), and that it may not have had the ability to refinance these obligations. The Prospectus omitted to state, however, that, despite the stability of the overall market, New Source would likely not be able to even make quarterly dividend payments on the Series A Preferred Units in the near future, because the Partnership's inability to replace production and add to its reserves was simultaneously destroying the value of its properties and increasing pressure on its credit facility. *See id.* at S-21 & S-22.

**<u>The 2014 10-K's Inadequate and Outdated Disclosures</u>**

80. The boilerplate disclosures in the Prospectus were largely copied verbatim from the Form 10-K for fiscal 2014 that was filed with the SEC on March 20, 2015 (the "2014 10-K"). The description of past results in the 2014 10-K and the generic, hypothetical risk factors

described therein were out-of-date or materially incomplete as to the operational and financial problems facing New Source at the time of the Offering.

81. For example, the 2014 10-K stated that, "in the fourth quarter of 2014 and continuing into 2015, oil and natural gas prices [had] declined significantly, which…cause[d] a reduction in [New Source's] revenue from…oil, natural gas and NGL production at the end of 2014," and was expected to continue into 2015. Additionally, the 2014 10-K stated that "lower oil and natural gas prices impact[ed] the amount of oil, natural gas and NGL that [New Source could] produce economically." *See* 2014 10-K at 12.

82. As for commodity prices being experienced and expected in 2015, the 2014 10-K stated:

- "Commodity prices are volatile, and continued low levels of or further declines in oil, natural gas and NGL prices may adversely affect our business, financial condition or results of operations and our ability to meet our capital expenditure obligations and financial commitments." *Id*. at 38.

- "Historically, the markets for oil, natural gas, and NGL have been volatile, as demonstrated in the fourth quarter of 2014 and into 2015. These markets will likely continue to be volatile in the future." *Id*.

- "Based on expected lower commodity prices, higher production costs and less drilling activity, we estimate revenue, operating income and cash flow from operations for our exploration and production business will decline. As such, results for the year ended December 31, 2014 are not indicative of the results that can be expected for the year ended December 31, 2015." *Id*. at 76.

83. These glosses on historical lower commodity prices and the hypothetical impact of their continuing throughout 2015 were outdated and misleading by the effective date of the Offering. As explained below, oil and natural gas prices had largely stabilized by the time of the Offering. In fact, New Source actually reported higher prices in the second quarter of 2015 than it did in the first quarter. Rather than update the 2014 10-K in the Prospectus to disclose the company-specific factors that were ***actually*** reducing the Partnership's revenue and affecting the

amount of oil, natural gas, and NGL that New Source could produce economically – such as New Dominion's unreliability and the growing need for corporate restructuring transaction(s) and an increase in commodity prices – the Offering Documents continued to misleadingly emphasize the purported effect of macroeconomic market factors on the Partnership.

84. The 2014 10-K's discussion of New Source's borrowing base status was also out-of-date and in need of material updates and clarification as well by the time of the Offering. The 2014 10-K stated the following:

- "[T]he covenants contained in the agreements governing our outstanding indebtedness could limit our ability to borrow additional funds, dispose of assets, pay dividends and make certain investments." *See id*. at 57.

- "If our revenues or the borrowing base under our revolving credit facility decrease as a result of lower oil, natural gas or NGL prices, operating difficulties, declines in reserves or for any other reason, all of which we experienced in the fourth quarter of 2014, we may have limited ability to obtain the capital necessary to sustain our operations at current levels. If additional capital is needed, we may not be able to obtain debt or equity financing." *Id*. at 50.

- "Based on projected market conditions and lower commodity prices, we currently expect that we will not be in compliance with our current ratio covenant in certain future periods." *Id*. at 77, 89, F-25.

By the effective date of the Offering, these warnings were out-of-date in that the Offering itself had replenished the borrowing base, seemingly with sufficient headroom but, as described in the Amended Petition, the Partnership, suffering losses in excess of its market cap, was in jeopardy of an immediate severe reduction in its borrowing base, due in part to New Dominion's incompetence, unreliability, and fraudulent activity.

85. As for the 2014 10-K's description of the litigation with New Dominion, it was woefully anodyne and also out-of-date by the effective date of the Offering. For example, the 2014 10-K described New Dominion's role in hypotheticals rather than as the unreliable and fraudulent contract operator New Source was grappling with:

- "New Dominion serves as the operator for all of our properties. The successful operation of our exploration and production business depends on continued utilization of New Dominion's oil, natural gas, and NGL infrastructure and technical staff as the operator of our properties. Failure of New Dominion to perform its obligations could have a material adverse effect on our operations and our financial results." *See id.* at F-40.

- "New Dominion serves as the operator for all of our properties. If New Dominion fails to perform or inadequately performs or if we have a material dispute with New Dominion, our operations will be adversely affected and our costs could increase or our reserves may not be developed, reducing our future levels of production and our cash flow from operations, which could affect our ability to make cash distributions to our unitholders." *See id.* at 42.

In fact, though the Partnership did not disclose this to investors, but made it abundantly clear in the Amended Petition, New Source needed to replace New Dominion as its contract operator in order to survive.

86. As for the litigation itself, the 2014 10-K merely stated:

- "[W]e are currently engaged in litigation with our contract operator and its affiliates [New Dominion], which has affected our exploration and production related cash flow." *Id.* at 76.

- "[W]e are currently engaged in litigation with New Dominion and its affiliates. Recently, New Dominion has withheld revenue otherwise payable to us for various reasons." *Id.* at 42.

Focusing solely on the withholding of revenue was far short of disclosing the drilling curtailment and the contract operator's fraud and utter unreliability, rendering what was said materially incomplete.

87. Indeed, the ultimate gloss on the litigation was shockingly tepid:

- "While the results of litigation and claims cannot be predicted with certainty, the Partnership believes the reasonably possible losses of such matters, individually and in the aggregate, are not material. Additionally, the Partnership believes the probable final outcome of such matters will not have a material adverse effect on the Partnership's consolidated financial position, results of operations, cash flow or liquidity." *Id.* at F-42.

The statements that there was a mere possibility of an adverse effect and that the outcome of the litigation would be immaterial were false and misleading. Indeed, less than two weeks after the 2014 10-K was filed, when New Source filed the Tulsa Action, the Partnership took quite a different stance with respect to the materiality of the issues underlying the New Dominion litigation, alleging quite vehemently that the difficulties with New Dominion had already "significantly impacted [New Source]'s cash flow," and that "[t]he damage to [the Partnership was] expected to be catastrophic, including interference with [New Source]'s ability to continue as a going-concern." No such disclosure appeared anywhere in the Prospectus, nor was the original litigation discussion in the 2014 10-K amplified in the Prospectus with material details of the Chernicky Litigation or updated to reflect material details of the Tulsa Action.

88. Moreover, just over two months after the 2014 10-K was filed, New Source alleged in a legal document that its damages – which could be traced back to 2013 and 2014 – exceeded $150 million. Thus, absent victory and/or replacement of its unreliable contract operator – both of which depended on resolution of the litigation – New Source was headed for operational and financial ruin.

**The Truth Begins to Trickle Out**

89. On July 29, 2015, New Source announced that it was suspending the quarterly cash dividend to common unitholders. Defendant Kos cited the "continued low commodity price environment coupled with current market conditions" as the impetus for the suspension. Defendant Kos further stated that "[p]reservation of this capital allow[ed] the Partnership to focus on executing [its] plan to restructure the business and position the Partnership for growth," and that New Source would "continue to analyze accretive acquisitions to grow the E&P business while [it] explore[d] the best opportunity to execute [its] restructuring plan to deliver

value" to the Partnership's unitholders. Although the restructuring plan would have likely been under development for months, the news of the restructuring plan a mere three months after the Offering came as a surprise to the market. Since New Source was having trouble in spite of the relative stability in commodity prices (as described below), Defendant Kos essentially admitted to the market what New Source had known all along – that market conditions needed to improve substantially in order for the Partnership to survive. While Defendants omitted material information necessary for investors to be fully informed, by investing in the Series A Preferred Units, investors were unknowingly betting that commodity prices would increase significantly and that New Source would complete a significant restructuring transaction. Indeed, investors did not know that they were putting their money into a company that would survive only if all the stars aligned.

90. On this news, the price of the Series A Preferred Units, which closed at $17.10 on July 28, 2015, dropped by 23% to close at $13.10 on July 29, and Janney downgraded New Source from "buy" to "neutral." Thus, the Series A Preferred Units, which were offered at a price of $25 per unit, had lost nearly half of their value in less than three months.

91. Less than two weeks later, on August 10, 2015, New Source reported its earnings for the second quarter of fiscal 2015. The Partnership reported a loss of $111 million, after reporting a profit in the same period a year earlier, and warned that it could have difficulty covering its financial obligations over the next twelve months.

92. In the Partnership's August 10, 2015 press release commenting on its financial and operating results for the second quarter, New Source again blamed a purported "depressed commodity price environment" and an overall "downturn in the industry" for its financial

troubles. As reflected in that same press release, however, both oil and natural gas prices ***rose*** from the first quarter of 2015 to the second quarter of 2015.

93. Indeed, while the Partnership blamed the "depressed commodity price environment" and the general "downturn in the industry" in this earnings release, macroeconomic market conditions actually remained relatively stable in the months immediately following the Offering. In fact, in the approximately 81-day period immediately after the Offering, oil prices averaged $56.89 per barrel, which is only 4.2% lower than the price of $59.39 per barrel on May 8, 2015, the effective date of the Offering. (*See* Crude Oil Historical Data 5/08/2015 - 07/28/2015, https://www.investing.com/commodities/crude-oil-historical-data (last visited Jan. 18, 2017)). Similarly, natural gas prices averaged $2.815 per Mcf during the same 59 trading days, down a negligible 2.2% from the May 8, 2015 price of $2.88 per Mcf. (*See* Natural Gas Historical Data 5/08/2015 - 07/28/2015, https://www.investing.com/commodities/natural-gas-historical-data (last visited Jan. 18, 2017)).

94. The domestic rig count also remained largely stable during this period, with the total U.S. rig count declining by a mere 20 rigs, or 2.2%, from May 8, 2015 to July 31, 2015. Particularly relevant to New Source, the rig count in the seven states in which the Partnership provided oilfield services declined by only 0.4% (three rigs) during this same period. (*See North America Rotary Rig Count (Jan 2000 - Current)*, Baker Hughes, http://phx.corporate-ir.net/phoenix.zhtml?c=79687&p=irol-reportsother (last visited Jan. 18, 2017)). Yet, in its August 10, 2015 press release announcing second quarter results, New Source blamed quarter over quarter declines in revenue and adjusted EBITDA for its oilfield aervices division on a "reduction in drilling activity as a result of lower commodity prices." Despite this downturn in the oilfield services segment, however, the Partnership's overall adjusted EBITDA in the second

quarter of 2015 was flat relative to the first quarter of 2015. As the ultimate driver of demand for New Source's oilfield services business was rig count, which barely declined on a macro level, the purported declines in demand for drilling-related oilfield services did not result from any deterioration in the general condition of the market, as the Partnership misleadingly suggested, but rather were caused by circumstances specific to New Source, which were not disclosed in the Offering Documents.

95. Further, although spot NGL prices were largely stable immediately following the Offering, NGL prices during this period were only slightly weaker than oil and gas prices. From May 8, 2015 (the date that the Offering closed) through July 28, 2015 (the last trading day before the Partnership disclosed its restructuring plan and suspended its common dividend), NGL prices declined only 8.7%, based on the aggregated average price changes of the reported prices for each of the five hydrocarbons that compose NGLs as delivered at Mont Belvieu. (*See* spot prices for the five components of NGL – ethane, propane, normal butane, iso-butane, and natural gasoline (pentane) – for 5/08/2015 to 7/28/2015, via Bloomberg LP, accessed Jan. 13, 2017).

96. New Source's NGL production, however, dropped precipitously from June 30, 2014 to June 30, 2015, down about 29% year over year. On a quarterly basis, NGL production dropped approximately 9% from the first quarter of 2015 to the second quarter of 2015. Such significant declines in production were far more drastic than what would be expected of mature, producing reservoirs like those owned by the Partnership, which normally would have had steeper production fall-offs in earlier years, followed by levelling out. Nevertheless, all of the Partnership's hydrocarbon production suffered from similarly unusual downturns during this period. As finally reported in the Partnership's second quarter 2015 earnings release, natural gas production was down nearly 28% for the quarter. Year over year, natural gas production had

declined almost 43%. Despite these extraordinary rates of decline—of which New Source would have been informed based upon daily, real-time production reports – the Partnership – in the Offering Documents or otherwise – failed to mention what was happening, or provide any color on what may have caused this highly unusual decline in production.

97. New Source's looming failure as a going concern, then, was not caused by negligible declines in a generally stable macro environment, but rather appears to have resulted from material, undisclosed problems, specific to the Partnership, which had persisted since at least 2013. In fact, the Partnership's adjusted EBITDA remained largely stable from the first quarter to the second quarter of 2015, and its distributable cash flow – along with both oil and natural gas prices – increased quarter to quarter. Lurking beneath these relatively stable market conditions, however, were material, company-specific threats that New Source had omitted to disclose to investors in the Series A Preferred Offering. Although some but not all of these problems were alluded to during the Partnership's legal battles with New Dominion, any disclosures related thereto were notably absent from the Offering Documents—despite being known by New Source management as far back as 2013.

98. Additionally, the August 10, 2015 press release stated that the Partnership's adjusted EBITDA was stable quarter to quarter, while distributable cash flow increased. It also noted property impairments for two of its business segments. These impairments resulted from so-called "ceiling tests" required by accounting standards, and would be charged against the Partnership's balance sheet equity account, thus not affecting cash flow. Although these impairments would not harm the Partnership's cash flow or affect the ability of New Source to operate its business, investors expect to be informed of these charges because of the insight they offer into the enterprise in which they are investing. Nevertheless, despite the fact that New

Source should have known these impairments were looming at the time of the Offering, the Offering Documents did not disclose that the Partnership would, within the quarter, experience impairments on both its oil and gas properties and its oilfield services business.

99. Despite the stable macro environment and relatively positive financial results for the Partnership, New Source included a "going concern" statement in its quarterly earnings release, concretizing the boilerplate language used in the Verified Petition in aid of the injunction request, and pointing out that it had violated debt covenants on some of its oilfield services related debt. As a result, the Partnership was faced with having to pay back the money owing under its credit facility sooner than expected, though New Source stated that there could "be no assurance that the [P]artnership [would] be successful in these efforts or that it [would] have sufficient funds to cover its operational and financial obligations over the next twelve months."

100. While this was the first time after the Offering Documents were disseminated that New Source informed the market in an earnings report or SEC filing about its doubts regarding its ability to continue as a going concern, as described above, the Partnership had stated, in a litigation pleading less than a month after the Offering, that the actions of New Dominion had caused damages to the Partnership in excess of $150 million – more than the entire market capitalization of the Partnership at that time. If New Source had ***already suffered*** such severe damages within a month of the Offering, it is simply not plausible that the Partnership did not have any strong doubts, well beyond the boilerplate assertion in the Verified Petition, about its ability to continue as a going concern at the time it filed the Offering Documents.

101. Analysts at Janney observed that the Partnership's guidance for the second quarter of fiscal 2015 implied "notably lower expectations versus what was implied in its 2015 guidance given in May," and noted a significant reduction in EBITDA for New Source's oilfield services

segment, which implied a "50% reduction in 2H15 expectations for the segment versus what was expected only just three months ago."

102. Janney also discussed the Partnership's disclosure that it had "violated debt covenants on debt tied to its oilfield services business," noting that, while it was unclear whether lenders would call for early repayment of the oilfield services debt, it was likely that the credit facility would be reduced further around October during the Fall re-determination, a scenario that would require New Source to attempt to raise additional capital. Analysts also expressed the opinion that the Partnership's violation of debt covenants was "likely the driver behind the recent suspension of the distribution."

103. Although these significant losses were looming at the time it filed the Prospectus with the SEC, no such statements were made in the Prospectus, and Defendants continued to downplay concerns during a conference call with analysts, again citing a "downturn in the industry" as a reason for the negative results posted by the Partnership in the second quarter of fiscal 2015.

104. On the news of the tremendous loss of $111 million during the second quarter of fiscal 2015, Baird downgraded units in New Source from a "buy" to a "hold."

105. As New Source continued to deteriorate, on September 9, 2015, the Partnership announced that the NYSE had decided to commence proceedings to delist the Partnership's common units from the exchange, due to its failure to maintain an average global market capitalization over a consecutive 30 trading-day period of at least $15 million.

106. New Source also announced on September 9 that the Partnership received notice from the NYSE of the failure of the Partnership's common equity to meet the NYSE continued

listing standard that requires the average closing price of a listed company's common equity to be above $1.00 per unit based on a period of 30 consecutive trading days.

107. On September 28, 2015, New Source announced that, due to a pending borrowing base deficiency under its revolving credit facility, it would not be paying the previously-declared quarterly cash distribution on its Series A Cumulative Preferred Units. On this news, the value of the Series A Preferred Units made a sharp drop, and Wunderlich lowered the price target from $1.00 to $0.00 based on expectations of the borrowing base redetermination proving to be worse than expected, increased liquidity concerns, and the ongoing litigation with New Dominion.

108. Analysts did not see any clear path for liquidity and associated value that could enable New Source to pay the cumulative preferred distribution on the Series A Preferred Units in October. Based on the Partnership's announcement of the larger-than-expected reduction in its borrowing base, analysts expected that New Source would be overdrawn by $16-$18 million.

109. On September 29, 2015, Baird downgraded shares of New Source from a "neutral" rating to an "underperform" rating, and Wunderlich downgraded shares of New Source from a "hold" rating to a "sell" rating. On October 13, 2015, Zacks downgraded the Partnership from a "hold" rating to a "strong sell" rating. As of Fall 2015, New Source had an average rating of "sell."

110. While the offering price on the Series A Preferred Units was $25.00 per unit, as a result of the revelation of the previously undisclosed financial and operational problems, the Series A Preferred Units are now essentially worthless.

**The Underwriters' Violations of the Securities Act**

111. Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

112. Section 12 of the Securities Act provides that any person who "offers or sells a security [...] by means of a prospectus or oral communication, which includes an untrue statement of a material fact" or omission of a material fact is liable. 15 U.S.C. § 77l(a)(2).

113. The Underwriter Defendants offered or sold New Source securities. The Prospectus indicated that New Source engaged Stifel, Baird, Janney, Oppenheimer, and Wunderlich as underwriters to conduct the Offering.

114. Both Section 11 and Section 12 provide that underwriters are liable for damages resulting from materially false misstatements contained in the Offering Documents.

115. It is commonly understood in the underwriting industry that the underwriters "prepare disclosure and conduct marketing" of the prospectus and registration statement. Goldman Sachs, *Report of the Business Standards Committee, January 2011*, at 13, *available at* <http://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf> (last visited June 20, 2016). Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id.*

116. It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

117. It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement and Prospectus for the May 2015 Offering) and that no material information is omitted that is needed to make the information provided therein not misleading.

118. In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers." Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, the investment bank Goldman Sachs published the *Report of the Business Standards Committee*, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." *Id.* Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id.* at 14.

119. In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability

provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (Emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriter Defendants here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement and Prospectus. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriter Defendants had this role and duty in underwriting the Series A Preferred Units of New Source. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

120. Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the Prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided. If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing. When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading. This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

121. As gatekeepers, underwriters must *independently* verify all material facts in offering documents. To conduct proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process. In other words, underwriters are required to play "devil's

advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

122. The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditors opinion at face value. The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

123. An issuer's financial health, including the issuer's total assets and whether the issuer was embroiled in lawsuits, are all material facts requiring inquiry and independent verification by underwriters. With respect to the importance of performing a reasonable due diligence investigation in regard to an issuer's financial condition, which investigation would clearly include such things as the appropriate checking of litigation involving the issuer, it is accepted practice within the investment banking community that the statements by the issuer about its own financial condition are not accepted by the investment bank at face value without adequately questioning the company's auditors and its accounting and financial officers, as well as independently verifying information with third parties.

124. Any reasonable due diligence investigation by an investment bank should include extensive and thorough interviews with both a company's chief financial officer and its auditor – separately, and not together, or in addition to being together. All areas of concern that an auditor

may have about the company and/or its accounting decisions should be discussed, with follow-up questioning if deemed necessary.

125. Here, proper due diligence would have required the underwriters to, *inter alia*, inquire and independently verify New Source's financial condition, and perform a litigation check to see if New Source was involved in any lawsuits and/or judgments. The Underwriter Defendants did not conduct anything close to a reasonable due diligence investigation in regard to the May 2015 Offering of New Source's Series A Preferred Units to investors. In particular, the Underwriter Defendants, had they performed proper due diligence, would have discovered the factual matters set forth in the Amended Petition in the Tulsa Action and not disclosed in the Offering Materials concerning the contract operator's unreliability and the adverse financial consequences to New Source flowing therefrom.

126. Moreover, it is an absolute requirement for due diligence in a stock offering that the underwriter conduct a public records search to ensure that there are no undisclosed lawsuits, judgments, or liens concerning the issuer. Had the Underwriter Defendants done such a public records search, it would have discovered the details of New Source's lawsuit against New Dominion and, in following up with the issuer, realized that New Source's financial health was in shambles.

127. The Underwriter Defendants' due diligence investigation of New Source, if in fact any actual due diligence was performed, failed to uncover, among other things, that New Source was suffering from severe financial and operational problems as a result of the fraud and utter incompetence of New Dominion, among other things, as well as the details and import of the New Dominion lawsuits. Any reasonable due diligence investigation would have uncovered these very important facts.

128. As a result of the Underwriter Defendants' failure to perform a reasonable due diligence investigation and/or not performing any due diligence investigation, the Prospectus misrepresented material information and omitted material information, rendering it materially false and misleading.

## CLASS ACTION ALLEGATIONS

129. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b), individually and on behalf of all those who purchased Series A Preferred Units from New Source pursuant and/or traceable to the Offering (the "Class"). Excluded from the Class are: Defendants herein; members of the immediate family of each of the Defendants; any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party. Also excluded from the Class are persons who have a net profit in purchases and sales of New Source Series A Preferred Units or otherwise suffered no compensable damages under the securities laws.

130. This action is properly maintainable as a class action because, *inter alia*:

(a) The Class is so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiffs at this time and will be ascertained through appropriate discovery, according to the Prospectus, New Source sold more than 1,760,000 Series A Preferred Units. As such, Plaintiffs believe there are hundreds, if not thousands, of members of the Class;

(b) There are questions of law and fact that are common to the Class including, but not limited to, the following:

i. Whether Defendants violated the Securities Act;

ii. Whether Defendants participated in and pursued the wrongful activities complained of herein;

iii. Whether the Prospectus and Registration Statement issued in connection with the Offering were materially false and misleading or omitted to state material facts revealed in part during litigation with New Dominion and/or the business, finances, and prospects of New Source;

iv. Whether the Individual Defendants and the Underwriter Defendants exercised due diligence in connection with the Offering;

v. Whether Defendants acted with due care in misrepresenting or omitting to state material information concerning New Source; and

vi. The extent of damages sustained by members of the Class and the appropriate measure of damages.

(c) Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to those of the other members of the Class;

(d) Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(e) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(f) Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g) The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. There will be no difficulty in managing this action as a class action.

## COUNT I

### (Violation of Section 11 of the Securities Act Against All Defendants)

131. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

132. Defendants offered and sold New Source securities to the investing public pursuant to the Prospectus that was disseminated to the public and filed with the SEC in connection with the Offering.

133. The Prospectus, at the time it became effective, was inaccurate and misleading, contained untrue statements of material fact, and/or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading as described above.

134. As the issuer of the Series A Preferred Units, New Source is liable under Section 11 of the Securities Act for the inaccurate and misleading statements contained in the Prospectus (including the documents incorporated by reference therein). Each of the remaining Defendants signed the Prospectus; was a director of New Source, or person performing similar functions, at the time of the filing of the Prospectus; underwrote the securities sold in the Offering; and/or was a controlling person of the Partnership within the meaning of Section 15 of the Securities Act.

Consequently, said Defendants are liable for the inaccurate and misleading statements contained in the Prospectus under Sections 11 and 15 of the Securities Act.

135. None of the Individual Defendants or the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true or that there was no omission of material facts required to be stated therein or necessary to make the statements made therein not misleading.

136. This action was brought within one year after the discovery of the untrue statements and omissions, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the securities were bona fide offered to the public. The earliest date by which discovery of the untrue statements and omissions could have been made in the exercise of reasonable diligence was July 29, 2015.

137. Plaintiffs and the other members of the Class purchased or otherwise acquired their Series A Preferred Units without knowledge of the untruths or omissions alleged herein. Plaintiffs and the other members of the Class were thus damaged by Defendants' misconduct, and by the material misstatements and omissions contained in the Prospectus. By reason of the foregoing, Defendants have violated Section 11 of the Securities Act.

## COUNT II

### (Violation of Section 12(a)(2) of the Securities Act Against All Defendants)

138. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

139. Defendants were sellers, offerors, and/or solicitors of purchasers of the Series A Preferred Units offered pursuant to the Prospectus.

140. By means of the Prospectus, and by using the means and instrumentalities of transportation and communication in interstate commerce and of the mails, Defendants offered and sold the Series A Preferred Units to Plaintiffs and the other members of the Class.

141. Each of the Defendants, in order to serve his or its own financial interests or those of the Partnership, sold and/or solicited the sale of the Series A Preferred Units to Plaintiffs and the other members of the Class. As specified previously herein, the Prospectus included untrue statements of material fact and omitted to state material facts necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

142. Neither Plaintiffs nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies, and omissions contained in the Prospectus at the time they purchased the Series A Preferred Units.

143. This action was brought within one year after the discovery of the omissions and misstatements contained in the Prospectus, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the sale of the Series A Preferred Units. The earliest date by which discovery of the omissions and misstatements could have been made in the exercise of reasonable diligence was July 29, 2015.

144. By virtue of the foregoing, Defendants have violated Section 12(a)(2) of the Securities Act and Plaintiffs and the other members of the Class have sustained damages.

145. Plaintiff and the other members of the Class hereby tender their Series A Preferred Units and seek consideration paid therefore with interest thereon, or seek damages to the extent permitted by law.

## COUNT III

**(Violation of Section 15 of the Securities Act Against the Individual Defendants)**

146. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

147. Each of the Individual Defendants was a control person of New Source by virtue of his position as a director and/or senior officer of New Source. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of New Source.

148. Each of the Individual Defendants was a culpable participant in the violation of Section 11 of the Securities Act, alleged in Count I above, based on their having participated in the preparation of the Prospectus and having otherwise participated in the process that allowed the Offering to be successfully completed.

149. This action was brought within one year after the discovery of the omissions and misstatements contained in the Prospectus, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the sale of the Series A Preferred Units. The earliest date by which discovery of the omissions and misstatements could have been made in the exercise of reasonable diligence was July 29, 2015.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23;

B. Awarding damages, together with interest thereon, against each Defendant and in favor of Plaintiffs and the members of the Class in an amount determined to have been sustained by them;

C. Awarding Plaintiffs and members of the Class punitive and exemplary damages as appropriate, as well as pre-judgment and post-judgment interest at the maximum rate allowable by law;

D. Awarding Plaintiffs and the members of the Class rescission on their Section 12(a)(2) claims, to the extent they still hold their Series A Preferred Units;

E. Imposing a constructive trust upon the proceeds of the Offering and any profits earned thereon;

F. Awarding Plaintiffs and the other members of the Class the costs and expenses of this litigation, including reasonable attorneys' fees, experts' fees, and other costs and disbursements; and

G. Awarding Plaintiffs and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
January 19, 2017

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Peter C. Harrar*
Peter C. Harrar
Correy A. Kamin
270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
Fax: 212-686-0114
harrar@whafh.com
kamin@whafh.com

-and-

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
Yu Shi
275 Madison Avenue, 34th Floor
New York, NY 10016
Tel.: 212-686-1060
Fax: 212-202-3827
pkim@rosenlegal.com
yshi@rosenlegal.com

***Co-Lead Counsel for Plaintiffs***